## ALLEN–QUALLEY CO. v. SHELLMAR PRODUCTS CO.

District Court, N. D. Illinois. March 22, 1929.

No. 8410.

Haight, Adcock & Banning, of Chicago, Ill. (George I. Haight, of Chicago, Ill., of counsel), for plaintiff.

Winston, Strawn & Shaw, of Chicago, Ill. (John C. Slade, of Chicago, Ill., of counsel), for defendant.

WALTER C. LINDLEY, District Judge. Plaintiff's bill seeks an injunction to bar defendant from making, using, or selling combination confection wraps of the kind made and sold by the plaintiff, and from using, revealing, or making known the processes and machinery likewise used by plaintiff in said manufacture, and a decree that the defendant be compelled to assign to plaintiff United States patent No. 1,640,-052, covering candy packages or wrappers consisting of a combination of transparent and opaque materials, issued August 23, 1927, and purchased by the defendant from the patentee, Olsen, on December 14, 1927.

Plaintiff is in the candy manufacturing business in St. Paul. In the early part of 1927 two of its employees perfected a new wrapper for candy packages, which contains a ribbon of transparent material called cellophane, and when wrapped about the candy affords a clear view of the contents of the package without unwrapping the same. So far as the defendant and plaintiff are concerned, at least, this was a new device. Previously such wraps had been made entirely of cellophane, which is expensive, brittle, and inclined to stick to the contents, or of translucent or opaque materials. Both parties admit that the new wrap was a very desirable improvement, and the representatives of both companies in their original conference agreed that it would meet with immediate and wide commercial success. Defendant had been and was then manufacturing other wraps for plaintiff, but the latter designed a machine for the manufacture of this one in its own plant. The perfecting of the wrap, the process for making it, and the machine by which it was manufactured, required the services of various employees of plaintiff for a period of from 12 to 15 months. Thereafter on November 25, 1927, Mair, the then general manager of plaintiff, met Martin, a representative of defendant, in Chicago and said to him that a new wrap had been designed; that the plaintiff's officers desired to make it themselves; but that he personally felt that it would be better to allow defendant to make it. This witness testifies that he told Martin that what he said to the former about the wrap was in confidence; that application for patent would be made, but had not yet been filed; that Martin agreed that the confidence would be respected, was most enthusiastic and said that the principle used in making the wrap was just what the trade was looking for. A few days later Martin and Miller, another representative of defendant, went to St. Paul and there interviewed the general manager, president, and secretary of plaintiff. They said they had come to see and confer with plaintiff concerning the new wrapper, and that they did not want to "let the grass grow under their feet." They stayed two days. The testimony of three witnesses for the plaintiff is to the effect that Martin and Miller were eager to secure the right to manufacture the wrap and use the process previously designed; that upon an agreement that the information should be confidential, the details of the machine and process were fully disclosed; that after a full conference an oral agreement was entered into, by virtue of which defendant was to be allowed to manufacture the wrap upon a specified royalty; that it was further agreed that a written contract should be prepared embodying this oral agreement. Martin and Miller returned to Chicago, and a few days later, in pursuance of an engagement, plaintiff's officers met defendant's patent counsel and defendant's representatives in separate conferences in Chicago. Counsel for defendant advised plaintiff he would not permit his clients to pay the royalty previously tentatively agreed upon by the parties. Defendant's patent counsel advised plaintiff that they were making a search of the patent records in Washington. After considerable negotiation, defendant refused to sign a written contract, and on December 14th, 1927, purchased the patent above mentioned by long distance telephone communications to San Francisco for the sum of $1,000. Thereafter, claiming it had a right so to do, defendant manufactured and sold wraps of the character mentioned, made by machines, which according to the testimony of one Angle, then employed by defendant, were based upon plaintiff's machine. This witness testified that directly after Miller returned from St. Paul he exhibited the wrap to Angle, and asked the latter if he could make the same and devise a machine for the making of the same; that at that time Miller described plaintiff's machine seen in St. Paul; that he (Angle) could not at first understand the directions; but that as he proceeded he

began to understand them. This machine was started directly after the return of the defendant's representatives from St. Paul, before the Olsen patent was purchased. Later defendant secured a standard machine from another source, but with the knowledge that it had of plaintiff's machine, made very material and substantial modifications in the machine it had purchased so as to adapt it to the making of this specific wrap.

It is evident that the parties entered into a tentative oral agreement in St. Paul, whereby defendant was to manufacture plaintiff's wrap; that the plaintiff in Chicago and St. Paul disclosed to the defendant, in confidence, all of the details concerning the wrap, the process of making the same and the machine for its manufacture; and that the defendant refused to execute a written contract in accordance with its tentative agreement because it believed the royalty demanded was too great and the arrangement inequitable.

Defendant's witnesses stated that upon their arrival in St. Paul, and prior thereto, plaintiff positively assured them that the alleged invention was fully covered by patents. These assurances, they say, were made in the face of the fact that all parties now concede and then knew that defendant had retained capable patent counsel to institute a search of the Patent Office and to determine whether the wrapper was adequately protected by patent. In other words, defendant's witnesses tell us that plaintiff's officers, upon the eve of an anticipated long-time relationship as licensor and licensee, deliberately falsified about the existence of a patent, well knowing that within a day or two defendant through its counsel would inevitably discover the falsity. If plaintiff's officers were rogues, they could but know that their roguery would be discovered at once by the people from whom they expected no benefits prior to the time when their roguery would become obvious and with whom they were anticipating entering into and maintaining profitable relationship. It is obvious from observation of the witnesses and from the circumstances in evidence that plaintiff's officers are not imbeciles, but ordinary business men, with at least some degree of business acumen.

The inescapable conclusion from the evidence is that plaintiff had no patent, that it had not then applied for one, that it confidentially informed defendant of the invention, that defendant, with plaintiff's knowledge, retained patent counsel to search the records, that plaintiff talked to such counsel about the wrapper, that he explained to them that there might be anticipating patents in the Patent Office, that plaintiff did not request that such search be terminated, but apparently acceded to the continuation of the same. Whether the lawyers were acting for both plaintiff and defendant jointly, as plaintiff claims, or for defendant alone, as defendant contends, it is unnecessary to determine in settling the issues involved.

■ In this situation the question at issue is whether or not the plaintiff is entitled to an injunction against the defendant's manufacture of the wrap and the use of its process in such manufacture and to the assignment of the patent purchased upon the payment of the purchase price thereof. The basic question involved is: Were plaintiff and defendant dealing at arms' length, or were their negotiations of such character as to put defendant in such position that in equity and good faith it was bound to respect the information given it by plaintiff and not to use the same for its own benefit and against plaintiff's interests? Plaintiff's witnesses swear they told defendant's representatives that the disclosure of the wrapper, the manufacturing process, and the machine was strictly confidential. One of defendant's witnesses says that he asked plaintiff to keep all of said facts secret and that plaintiff replied there was no necessity for maintaining secrecy, because plaintiff was fully protected by patent. One of them says, not that plaintiff did not ask that the disclosure be treated as confidential, but that he remembers no such request. Defendant learned in confidence that plaintiff had what it called an invention for a wrapper; that plaintiff had designed a machine for producing the wrapper. It had seen the wrapper and the machine and knew that plaintiff considered both of great value and anticipated substantial profits from the same. Defendant was enthusiastic about the merits of the wrapper and was negotiating for a license to manufacture it. Could it, with knowledge of these facts, buy a so-called prior patent to which its attention had been called by reason of the disclosure made, cut off negotiations with plaintiff, and assert that it has the right to use plaintiff's process, to use plaintiff's machine or an adaptation thereof, or to make plaintiff's wrapper without accounting to plaintiff in any manner? Was it not under the duty to say to plaintiff, "We are not further interested," and cease its search and desist from making that which plaintiff had disclosed? If it discovered a so-called prior patent, was it not bound to disclose the same to plaintiff, and if it purchased same, to offer it to plaintiff? Are the

296

demands of commercial integrity satisfied by the actions of defendant? If men in the business world are to respect the rights of others, if we are to insist upon morality in contractual dealings, if honesty is to prevail in commercial intercourse between citizens, a court of equity must put the stamp of disapproval upon what defendant has done here.

It is not necessary to find that plaintiff and defendant entered into a binding contract; it is not necessary to find that patent counsel represented plaintiff. Such counsel were at least the agents of defendant, and their acts were those of defendant, and though those acts were probably wholly ethical and innocent from the point of view of counsel, the information received by defendant from counsel was of such character that defendant should have fully disclosed same to plaintiff.

The question is not one of contracts, of patents, or of professional conduct of counsel. It is a question of the validity in equity of the acts of defendant in receiving in confidence, pending making contractual relationship, under an agreement to treat the same as confidential, a disclosure of the plaintiff's secrets, using such disclosure to locate a patent, directing its machinist to make a machine like plaintiff's machine, procuring an assignment of patent it claimed covered the alleged invention, and refusing to account to plaintiff. It is not necessary that defendant should have adopted plaintiff's machine in all its aspects. The mechanic says he started the machine, as directed by Miller, immediately upon the latter's return from St. Paul, fresh from admitted observation of plaintiff's machine, and could not understand the details thoroughly, but that as he progressed he saw more clearly the reasons for the suggestions and description given him directly after Miller and Martin had seen plaintiff's machine. The machine has probably been improved upon, but plaintiff's structure was the foundation for defendant's machine.

■ It is well established that equity will enjoin the use and disclosure of trade secrets, such as processes, formulæ, and inventions learned in confidence. The difference between secret processes and patents is that the owner of a patent has a monopoly against all the world, while the owner of a secret process has no right "except against those who have contracted, expressly or by implication, not to disclose the secret, or who have obtained it by unfair means." See Tower Mfg. Co. v. Monsanto Chemical Works (D. C.) 20 F.(2d) 386. The jurisdiction of equity to protect such trade secrets is founded upon trust or confidence. The court "fastens the obligation upon the conscience of the party, and enforces it against him in the same manner as it enforces against a party to whom a benefit is given, the obligations of performing a promise on the faith of which the benefit has been conferred." Hopkins on Trade-Marks, Trade-Names and Unfair Competition (4th Ed.) 239. Whether the subject-matter is patentable or not, if the designer discovers and keeps secret a process of manufacture, though he will not have an exclusive right to it as against the public, after he shall have published it, or against those who in good faith acquire knowledge of it, yet he has a property right, which a court of chancery will protect against one who in bad faith and breach of confidence undertakes to apply it to his own use. Cases in which this doctrine have been invoked are Booth v. Stutz Motor Car Co. of America (C. C. A.) 24 F.(2d) 415; Thum Co. v. Tloczynski, 114 Mich. 149, 72 N. W. 140, 38 L. R. A. 200, 68 Am. St. Rep. 469; Eastman Kodak Co. v. Powers Film Products, 189 App. Div. 556, 179 N. Y. S. 325; Boylston Coal Co. v. Rautenbush et al., 237 Ill. App. 550. See, also, 20 R. C. L. 1163.

The plaintiff at the time it divulged the information to defendant was not yet exhibiting the product to the world. It was giving information to nobody except to the defendant, as a proposed licensee, and under an agreement that the information should be treated as confidential. The relationship between them was one of trust and confidence. The language of Mr. Justice Holmes in E. I. Du Pont de Nemours Powder Co. v. Masland, 244 U. S. 100, 37 S. Ct. 575, 61 L. Ed. 1016, is peculiarly pertinent, when he says: "Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied but the confidence cannot be." The same justice, in discussing the rights of the Chicago Board of Trade in quotations on prices of grain collected by itself, in Board of Trade of Chicago v. Christie G. & S. Co., 198 U. S. 236, 25 S. Ct. 637, 49 L. Ed. 1031, says: "It stands like a trade secret. The plaintiff has the right to keep the work which it has done, or paid for doing, to itself. The fact that others might do similar work, if they might, does not authorize them to steal the plaintiff's."

■ It is apparent that it is immaterial in exercising this particular jurisdiction of equity, so far as the immediate parties are

concerned, whether there is a valid patent owned by plaintiff or not. The basis for the jurisdiction is that the inventor is not required to apply for a patent, but is entitled to a protection of his process and device against a publication thereof and the misuse thereof by one who is guilty of a violation of trust and confidence. See Vulcan Detinning Co. v. American Can Co., 72 N. J. Eq. 387, 67 A. 339, 12 L. R. A. (N. S.) 102; Vulcan Detinning Co. v. Assmann et al., 185 App. Div. 399, 173 N. Y. S. 334; Booth v. Stutz Motor Car Co. of America, 24 F.(2d) 415; Schavoir v. American Re-Bonded Leather Co., 104 Conn. 472, 133 A. 582; and Wireless Specialty Apparatus Co. v. Mica Condenser Co., 239 Mass. 158, 131 N. E. 307, 16 A. L. R. 1170. It should be observed, moreover, that by revealing the wrap to the world, after the defendant had begun to violate the confidence reposed in it, and after applying for a patent therefor, plaintiff did not lose its rights as against defendant, and that it has never revealed to the world the particular process for making the wrap.

Defendant contends that in view of the fact that the Milwaukee Printing Company has been granted by the plaintiff the exclusive right to make the wrap, subsequent to the filing of this bill, it has lost the right to maintain this suit. The court does not understand such to be the law. The plaintiff still has a right to the manufacture of its wrap by such licensee uninterrupted by defendant and in the profits to be realized therefrom. Furthermore, it might maintain this suit for the benefit of its licensee. See Birdsall v. Delaware & H. Co. (D. C.) 216 F. 717.

Patent counsel, at the request of defendant, secured the Olsen patent. The circumstances were such that the purchase of this patent was, so far as defendant is concerned, a violation of trust, and the patent itself is therefore imbued with a trust relationship. That the court has the jurisdiction to compel the surrender of the said patent to the plaintiff upon repayment to the defendant of the purchase price expended by it seems to follow from the reasoning of the United States Circuit Court of Appeals in National Wirebound Box Co. v. Healy, 189 F. 49.

It may well be that if defendant had never been in a confidential relationship with the plaintiff, upon the plaintiff's publication to the world of its wrap, the defendant might rightfully have purchased the same. Not by any action of plaintiff, but by its own violation of confidence, it has deprived itself of that opportunity, which is open to the rest of the world. It cannot obtain in confidence the details of an alleged invention, of the process for making the same, and of the machine by which it is made, and proceed to make the product by that or similar process, or by equivalent or similar machine or methods before the plaintiff makes its publication to the world, and then assert that it is a member of the public to whom the publication has been made. A court of equity cannot approve such breach of confidence.

There will be a decree for the relief prayed.