**NORTHUP v. REISH et al.**

No. 10613.

United States Court of Appeals
Seventh Circuit.

Jan. 7, 1953.

———◆———

Eugene C. Knoblock, South Bend, Ind., for appellant.

Will Freeman and A. W. Molinare, Chicago, Ill., Warren A. Deahl, South Bend, Ind., George E. Frost, Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and KERNER and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This is an appeal from a judgment in which the defendant, George D. Reish, was found guilty of violating a relationship of confidence and trust which existed between him and the plaintiff, Harry R. Northup, as a result of which violation the defendants, George D. Reish and Reish Products, Inc., were unjustly enriched at the expense of the plaintiff. In this same action the plaintiff also alleged infringement of his United States Letters Patent No. 2,466,859, dated April 12, 1949, entitled "Oven Liners." The trial court dismissed the count based on the alleged patent infringement on the ground that there was no patentable invention in view of the prior state of the art and held that each of the three claims thereon was invalid. From this part of the judgment the plaintiff has not appealed.

Early in 1945 the plaintiff Northup realized the need for some easier method of taking care of boil-overs in the ovens of cooking stoves and of catching the drippings when food was being broiled in such stoves. He realized that a piece of material placed under the broiler or under the food being cooked in the oven would have to be of a material which would not be consumed or melted by the heat in the oven and that the liner would have to be comparatively inexpensive and easily disposable. Northup experimented with various materials and finally determined that a very thin sheet of aluminum foil, cut in a rectangular form and placed under the food being cooked or broiled, would serve the purpose. He first used a piece of smooth aluminum foil with the edges turned over to form a hem.

At about this time, July 10, 1946, the Consumers Products Corporation published an advertisement in the South Bend Tribune in South Bend, Indiana, soliciting the opportunity to finance and develop ideas and patents for persons in need of such help. In response to this advertisement the plaintiff called on the Consumers Products Corporation and interviewed the defendant, George D. Reish, who was then an officer of that company. In the first interview the

plaintiff did not disclose his idea to Reish because, as he testified, "I did not want to divulge this thing until I was pretty well assured I would not be taken advantage of, because at this time we had no patent applied for on it; it really was not in merchantable form." The plaintiff said Reish gave him such assurances and a short time later, in a subsequent conference with Reish and Mr. Fries, another officer of Consumers Products Corporation, he (Northup) told them of his idea and left with them samples of his oven liners which were embossed in a pebbled form which he had found tended to stiffen the liners and tended to hold more of the food juices which would boil over or drip down from the food. The plaintiff says that at that time he told Reish and Fries, concerning such oven liners, the costs, consumer reaction and possible outlets, and discussed with them the possibility of Consumers Products Corporation manufacturing and financing the liners. The plaintiff also said, though, that at that conference they all agreed that in its then form the oven liner was not a merchantable item.

Shortly thereafter, in August 1946, Reish became ill and had no further contacts with Northup until May 1947. About September 18, 1946, Northup started marketing a pebbled form of embossed oven liners under his trade-mark, "Oven Maid." A couple of months later the plaintiff changed to his present form of embossed liner, on which the embossing is of a rectangular type, which plaintiff has manufactured and sold continuously since November 1946. In the Fall of 1946 Reish resigned as President of Consumers Products Corporation. In November 1946, Consumers Products Corporation purchased some foil from Northup to sell as oven liners.

Reish's next contact with Northup was on May 10, 1947, when he, Reish, purchased 48 dozen of the plaintiff's oven liners for resale. Northup testified that shortly thereafter Reish wanted him to make oven liners for Reish; that Reish then just wanted Northup to supply him the oven liners which he (Reish) would then package and sell under his own trade-mark and trade name. Northup did not agree to this and, in October or November 1947, the Nu Products Company of Constantine, Michigan, started making oven liners for Reish Products, Inc., a corporation which Reish had formed. These oven liners were made on a machine which Nu Products Company built for the Reish corporation and of material which the Reish corporation furnished. Prior to the building of the machine Reish furnished Nu Products Company with a sample of the Northup oven liners which Reish had purchased from Northup. On September 1, 1949, the defendant, Reish Products, Inc., started to manufacture oven liners for itself, using a type of embossing which utilized its trade-mark, "Ovnap." These liners were distributed by the defendant corporation under its own name, in packages which were distinctive and which could not be confused with the packages of oven liners being manufactured and sold by the plaintiff.

The trial court, in finding against the plaintiff as to the patent infringement found that:

"9. At least as early as 1932 printed publications had been issued which taught that a thin sheet of aluminum foil could be used in cooking in many different ways, and that it could be used to catch and retain juices escaping from food being cooked.

"10. All of the physical and structural properties of the oven liner defined in the claims of plaintiff's patent, i. e., a sheet of flat metal foil having a melting point higher than that attained in cooking ovens, the disposable character of such a sheet, the thickness of such a sheet less than .005 of an inch, the cutting of such a sheet in predetermined size and to rectangular shape, and the forming of embossments or shallow pockets or recesses over substantially the entire area of such a sheet to impart slight rigidity thereto, were known in the art for many years prior to 1946, and aluminum foil having such structural characteristics was sold and widely distributed for many uses and purposes for at least twenty years prior to the trial of this action.

"11. The claims of the plaintiff's patent merely define a *use* analogous

to those known in the prior art and involve no substantial difference in structure from aluminum foil known in the prior art. (Our emphasis.)

"12. None of the claims of plaintiff's patent defines an invention when considered in view of the prior state of the art."

The trial court thus correctly found that the claims of the plaintiff's patent described only another "analogous" manner or way of using embossed aluminum foil, a product which had long been known and manufactured, for catching and retaining juices escaping from food being cooked, and, therefore, held that none of the plaintiff's claims defined an invention and that plaintiff's patent was invalid.

But the trial court also found that the plaintiff did disclose in confidence to the defendant Reish this "analogous" use of embossed aluminum foil; that after Reish became ill and inactive in Consumers Products Corporation, that company, "with the knowledge and cooperation of the plaintiff, displayed oven liner samples to numerous persons for the purpose of securing the reaction of the trade"; and that in "September, 1946, the plaintiff commenced the sale of embossed oven liners for resale to consumers." The trial court found that several months after the plaintiff had commenced the sale of his oven liners for resale to consumers, the defendant Reish purchased some of the oven liners from the plaintiff and called upon the trade for the purpose of testing consumer reaction. The trial court found further that it was approximately a year after the plaintiff had started the sale of his oven liners for resale before the defendant Reish, "after unsuccessfully attempting to induce the plaintiff to manufacture embossed oven liners for him," organized the defendant company and began the production and sale of oven liners substantially similar to those being manufactured and sold by the plaintiff. Yet the trial court held that this production and sale of oven liners by the defendant constituted a "violation of the confidential and fiduciary relationship of the plaintiff and the defendant George D. Reish, and result-

ed in the unjust enrichment of the defendants at the expense of the plaintiff."

The judgment of the trial court permanently enjoined both defendants and their officers, agents and representatives "from denominating, selling or offering for sale as oven liners foil sheets containing a multiplicity of embossments, from explaining, illustrating or describing, upon packages in which foil sheets with multiple embossments are sold or offered for sale by the defendants, the usability of said foil sheets with multiple embossments as oven liners, from advertising said foil sheets with multiple embossments as oven liners, and from placing such foil sheets in packages or wrappers supplied by defendants' customers, which packages or wrappers indicate thereon the usability of foil sheets with multiple embossments as oven liners." This judgment also required the defendants to account for and pay to the plaintiff the damages which the plaintiff suffered as a result of the "wrongful" acts of the defendants.

Considering the entire record, including all of the facts found by the trial court and other relevant facts, the evidence of which was not disputed, we are of the opinion that the finding and conclusion of the trial court, that the manufacture and sale by the defendants of oven liners was a violation of a confidential relationship existing between the plaintiff and Reish and resulted in the unjust enrichment of the defendants at the expense of the plaintiff, was clearly erroneous.

The plaintiff would now have us believe that all of the contacts between Reish and the plaintiff, including the initial advertisement which was inserted in the South Bend Tribune by the Consumers Products Corporation, were part of a malicious scheme by Reish to steal and appropriate to himself, for his profit, plaintiff's idea. The trial court did not so find, nor would the evidence sustain such a finding. The most that can be said for plaintiff's case is that, while plaintiff was negotiating with Reish for help in developing and financing his then unperfected idea for an oven liner, he disclosed to Reish a use for sheets of embossed aluminum foil, a "use analogous to those known in the prior art" and involving

"no substantial difference in structure from aluminum foil known in the prior art."

It may be true that the use of sheets of aluminum foil in this manner and for this purpose was new to the plaintiff and to the defendant Reish. The court found that the first disclosure made of these oven liner samples to other persons was made after Reish became ill and was made "with the knowledge and cooperation of the plaintiff * * * for the purpose of securing the reaction of the trade." The court then found that in September 1946, while Reish was still ill and inactive, the plaintiff commenced the sale of his embossed oven liners for resale to consumers. In view of the article involved and the manner in which it was packaged and distributed, this distribution by the plaintiff necessarily revealed his idea for another "analogous" use of sheets of embossed aluminum foil to the public. Packages of the oven liners, as marketed by the plaintiff, described their purpose and illustrated the manner of their use by both pictures and words. The containers in which plaintiff's oven liners were sold told the public everything that the plaintiff had told Reish about the oven liners. After the liners had been so marketed the plaintiff no longer had any secret about their composition, their style of embossment, their size, their shape, the method of their use, nor their disposal after they were too soiled for further use.

We do not mean to imply by our emphasis on the fact that plaintiff's "secret" was only an "analogous use" for sheets of embossed aluminum foil, that a "secret" must be a patentable invention in order to be protected by equity against its unauthorized use by one to whom the secret has been disclosed in confidence. We are only trying to emphasize the fact that we are not dealing here with a secret process, machine or method of manufacturing, but only with a simple use which was necessarily fully disclosed to the public by the plaintiff when he marketed his oven liners.

Only after the plaintiff had marketed his oven liners did the defendant Reish come back into the picture. He then purchased a quantity of oven liners from the plaintiff, as anyone else might have done, and called

upon the trade "for the purpose of testing customer reaction." Before Reish did this he had made an unsuccessful attempt to induce the plaintiff to manufacture embossed oven liners for him which he intended to market under his own trade-mark and trade name. This attempt by the defendant would certainly seem to negative the idea that all of his prior dealings with the plaintiff were a part of a malicious scheme to steal the plaintiff's idea.

The plaintiff relies strongly on Allen-Qualley Co. v. Shellmar Products Co., D.C., 31 F.2d 293, but the facts in that case are a far cry from the factual situation with which we are here confronted. There the plaintiff was a candy manufacturer and the defendant was the manufacturer of wraps for some of plaintiff's candies. Two of the plaintiff's employees perfected a new wrap for candies. The perfecting of the wrap, the process for making it and the machine by which the wrap was manufactured, required the services of several of the plaintiff's employees for some twelve to fifteen months. In a conference between representatives of the plaintiff and the defendant, upon an agreement that the information should be confidential, "the details of the machine and process were fully disclosed", 31 F.2d at page 294. A tentative agreement between the parties was reached whereby the defendant was to be allowed to manufacture the wrap upon a specified royalty. The defendant's patent counsel advised the plaintiff that they were making a search of the patent records. This search revealed a prior patent. The defendant then refused to sign a written contract with the plaintiff embodying the tentative agreement they had made and, without plaintiff's knowledge, defendant purchased the prior patent. The defendant then began the manufacture and sale of wraps on a machine which was based on plaintiff's machine. The court there described the question to be decided as follows, 31 F.2d at page 296:

"It is a question of the validity in equity of the acts of defendant in receiving in confidence, pending making contractual relationship, under an agreement to treat the same a confidential, a disclosure of the plaintiff's

secrets, using such disclosure to locate a patent, directing its machinist to make a machine like plaintiff's machine, procuring an assignment of patent it claimed covered the alleged invention, and refusing to account to plaintiff."

The confidential disclosure made in that case was a process for manufacturing and the details of the machine for the manufacture of the wrap. The confidential disclosure in that case enabled the defendant to find a controlling patent which the defendant bought behind the plaintiff's back and which the defendant then claimed gave it the right to make and use a machine, the details of which machine had been disclosed by plaintiff to defendant in confidence. The plaintiff there never revealed to the world the particular process for making the wrap. The court concluded that opinion by saying, 31 F.2d at page 297:

"It (the defendant) cannot obtain in confidence the details of an alleged invention, of the process for making the same, and of the machine by which it is made, and proceed to make the product by that or similar process, or by equivalent or similar machine or methods *before the plaintiff makes its publication to the world*, and then assert that it is a member of the public to whom the publication has been made." (Our emphasis.)

The trial court cited, as authority for its decision, Booth v. Stutz Motor Car Co. of America, 7 Cir., 56 F.2d 962, 969. In that case Booth, the plaintiff, submitted detailed blue prints and drawings of a new design for an automobile to the defendant on assurance that his plans would not be divulged except to the officers and directors of the company to enable them to determine whether they should purchase the design from the plaintiff. The company rejected Booth's offer to sell the design but retained the detailed blue prints and drawings. Sometime later the defendant brought out a new model automobile in which it had utilized features of the plaintiff's design. This court held that the defendant should account to Booth for the profits it had realized from the sale of its new model car "to whatever extent it may appear that the Booth designs, *apart from those features of them which were common property,* contributed to the success of the Stutz car, as well as to the extent that it may appear that Booth through Stutz's inequitable appropriation was harmed * * *." (Our emphasis.) It is to be noted that in that case the court granted recovery to the plaintiff for only the novel features of his design which the defendant had used. In the instant case all features of plaintiff's oven liners were "common property" after plaintiff sold them to the public and before the defendants started making them.

In A. O. Smith Corporation v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531, the fraudulent appropriation considered involved certain secret processes in the field of electric arc welding used in the fabrication of oil pressure vessels. In that opinion the court said, 73 F.2d at page 539:

"It is sufficient to say that we find the evidence as to discovery, *secrecy,* appropriation, and breach of confidence not only substantial but compelling our independent judgment as to the correctness of decision below." (Our emphasis.)

In that case the defendant had tried in many ways to obtain the plaintiff's secret processes so that it might successfully compete with plaintiff. The defendant finally employed a man who had worked in plaintiff's welding department and was under an express contract not to divulge plaintiff's secret processes. There the processes were still trade secrets when the defendant procured them and used them against the plaintiff.

In Chesapeake & Ohio Ry. Co. v. Kaltenbach, 4 Cir., 95 F.2d 801, 806, and in Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 923, it was held that:

"* * * 'Where, in advance of the granting of a patent, an invention is disclosed to one who, in breach of the confidence thus reposed, manufactures and sells articles embodying the invention, such person should be held liable for the profits and damages resulting therefrom, not under the patent statutes, but upon the principle that

equity will not permit one to unjustly enrich himself at the expense of another'."

We think all of the above decisions are sound but do not believe any of them, nor any other decision we have found, supports the plaintiff's contention in a case where, as here, the plaintiff has made a full disclosure to the public long before the defendant started to manufacture and sell the article.

The judgment is reversed and the cause remanded with instructions that it be dismissed with prejudice.

Judge KERNER participated in the hearing, consideration and decision of this case, but he died prior to the preparation and pronouncement of this opinion.