I. Jonas SPECINER, Trustee in Bankruptcy of A.B.C. Steel Equipment Co., Inc., Plaintiff,

v.

REYNOLDS METALS COMPANY, Defendant.

United States District Court
S. D. New York.
Sept. 30, 1959.

Louis C. Fieland, New York City, Clarence S. Barasch, New York City, of counsel, for plaintiff.

Lundgren, Lincoln & McDaniel, New York City, Walter C. Lundgren, New York City, of counsel, for defendant.

DIMOCK, District Judge.

This is an action for an injunction and an accounting of profits brought by the trustee in bankruptcy of A.B.C. Steel Equipment Co., Inc., hereinafter "ABC". Plaintiff contends that ABC disclosed to defendant in confidence information about an aluminum casement window which had been developed by ABC and that defendant thereafter made use of this information by incorporating various features of the ABC window in a window manufactured and sold by defendant. The information alleged to have been imparted in confidence and wrongfully appropriated by defendant included the metallurgy, design and function of the ABC hinge, the method of heading the rivet on which the hinge pivoted, and the design and function of the window's putty-retaining edges. Plaintiff claims that those features were trade secrets.

The ABC window was on the market prior to the date of the alleged disclo-sure and defendant claims that prior to that date it had purchased and examined an example of the window. It is clear that defendant did manufacture and market a window substantially identical with the ABC window as far as concerns the design and function of the hinges, the method of heading the pivot rivets, and the design and function of the putty-retaining edges. On the trial it appeared that the metallurgy of the defendant's window wholly differed from that of the ABC window so that we are concerned only with the design and function of the hinges, the method of heading the pivot rivets, and the design and function of the putty-retaining edges.

As will hereinafter appear, I have come to the conclusion that, when the ABC window was put on the market, its design ceased to be a trade secret so that it is unnecessary for me to pass upon the question whether the disclosure was in confidence or to pass upon the sharply contested question whether defendant made use of it in developing its window or merely copied an ABC window which it had previously bought in the open market.

The general rule is that, when a person learns trade secrets by means of a confidential relationship, relief may be obtained against their use to the advantage of that person at the expense of the rightful possessor. Franke v. Wiltschek, 2 Cir., 209 F.2d 493; Smith v. Dravo Corp., 7 Cir., 203 F.2d 369; Schreyer v. Casco Products Corp., 2 Cir., 190 F.2d 921, certiorari denied 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, certiorari denied 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395. The Restatement defines a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." It continues: "The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropri-

ated by one as his secret." Restatement, Torts, § 757, comment b; see Kaumagraph Co. v. Stampagraph Co., 235 N.Y. 1, 138 N.E. 485, and National Starch Products v. Polymer Industries, 273 App.Div. 732, 79 N.Y.S.2d 357. Plaintiff argues for the broader rule that one who asks for information from another and obtains it in confidence and then uses it in breach of that confidence cannot complain when it thereafter develops that the information was already generally known, quoting from Fairchild Engine & Airplane Corp. v. Cox, Sup., 50 N.Y.S.2d 643, and L. M. Rabinowitz & Co. v. Dasher, Sup., 82 N.Y.S.2d 431. It should be observed that both cases involved an employer-employee relationship, which is absent here. Here the parties contemplated a buy-sell contract. There was testimony to the effect that defendant expressed interest in manufacturing certain parts of the window itself if an agreement were consummated, but there is no indication that this was to be done for plaintiff's benefit any more than furnishing plaintiff with aluminum with which to make the windows, as was also contemplated, would be. In both situations defendant would be acting on its own behalf and not as plaintiff's agent or distributor. Compare Cowley v. Anderson, 10 Cir., 159 F.2d 1, where it was held that defendants had agreed to be the exclusive distributor of plaintiff's product in a designated territory. It is a well-recognized rule of the law of agency that an agent owes a high duty of loyalty to his principal. Restatement, Agency II, § 387. "Unless otherwise agreed, after the termination of the agency, the agent * * * (b) has a duty to the principal not to use or to disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty." Restatement, Agency II, § 396. It can be seen that the basis for the two courts' claimed broader formula-

tion could have been laid in this agency rule which includes confidences which are not trade secrets. The Fairchild and Rabinowitz courts were aware of the rule. In Fairchild, the court quoted with approval section 396 of the Restatement. 50 N.Y.S.2d at page 654. The Rabinowitz court stated, "It is implied in every contract of employment that the employee will hold sacred any trade secrets *or other confidential information* which he acquires in the course of his employment." (Emphasis added.) 82 N.Y.S.2d at 435. Thus, the only cases quoted as standing for plaintiff's broader proposition can be explained as resting on a rule of law that is dependent on a relationship that does not exist in this case.

Since the recovery in this case must be based on the existence of matters belonging to ABC which were not "of general knowledge in an industry" and since ABC's window had been placed on the market prior to the conferences between ABC and defendant, defendant argues that whatever veil of secrecy surrounded the ABC window had been lifted before any information was disclosed to defendant. Plaintiff, on the other hand, claims that the method of manufacture and the design of the window did not lose their secret character merely by ABC's placing the window on the market and cites Franke v. Wiltschek, 2 Cir., 209 F.2d 493, supra; Smith v. Dravo Corp., 7 Cir., 203 F.2d 369, supra; and Schreyer v. Casco Products Corp., D.C.D.Conn., 97 F.Supp. 159, affirmed as to unfair competition issue, 2 Cir., 190 F.2d 921, supra. The District Court in Schreyer said, 97 F.Supp. at page 168:

"It is true that matters which are completely disclosed by goods on the market are not trade secrets. Mycalex Corp. America v. Pemco Corp., D.C.Md.1946, 64 F.Supp. 420. Relying on this proposition, the defendants contend that all the information revealed by the blueprints and blanks could have been ascertained by careful analysis of the

Steam-O-Matic iron which was obtainable on the market. By measuring the component parts, they say, blueprints could have been prepared and the most efficient productive method deduced. The fact remains, however, that the defendants took unwarranted advantage of the confidence which the Schreyers reposed in them and obtained the desired knowledge without the expenditure of money, effort and ingenuity which the experimental analysis of the model on the market would have required. Such an advantage obtained through breach of confidence is morally reprehensible and a proper subject for legal redress. See A. O. Smith Corp. v. Petroleum Iron Works Co., 6 Cir., 1934, 73 F.2d 531."

In Smith v. Dravo Corp., the court announced, 203 F.2d at page 375:

"It is unquestionably lawful for a person to gain possession, through proper means, of his competitor's product and, through inspection and analysis, create a duplicate, unless, of course, the item is patented. But the mere fact that such lawful acquisition is available does not mean that he may, through a breach of confidence, gain the information in usable form and escape the efforts of inspection and analysis. * * *

" * * * Here was no simple device, widely circulated, the construction of which was ascertainable at a glance. Cf. Carver v. Harr, 132 N.J.Eq. 207, 27 A.2d 895 and Northup v. Reish, 7 Cir., 200 F.2d 924. If such were the case our problem would be simple. Instead we are concerned with a relatively complex apparatus; designed to carry large and heavy amounts of cargo; proper inspection of which was, perhaps, accessible to defendant but, in no way shown to have been made. Under such circumstances the District Court's conclusion that plaintiffs no longer possessed a trade secret at the time of their negotiations with defendant was erroneous."

The Franke court adopted the following language from the leading case of Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12:

" 'If a valuable medicine, not protected by patent, is put upon the market, any one may, if he can by chemical analysis and a series of experiments, or by any other use of the medicine itself, aided by his own resources only, discover the ingredients and their proportions. If he thus finds out the secret of the proprietor, he may use it to any extent that he desires without danger of interference by the courts. But, because this discovery may be possible by fair means, it would not justify a discovery by unfair means, such as the bribery of a clerk who, in course of his employment, had aided in compounding the medicine, and had thus become familiar with the formula. * * *

" 'The fact that one secret can be discovered more easily than another does not affect the principle. Even if resort to the patterns of the plaintiff was more of a convenience than a necessity, still, if there was a secret, it belonged to him, and the defendant had no right to obtain it by unfair means, or to use it after it was thus obtained. We think that the patterns were a secret device that was not disclosed by the publication of the pump, and that the plaintiff was entitled to the preventive remedies of the court.' " 209 F.2d at pages 495–496.

In Franke the product in question, a compressed face cloth, had been marketed prior to the confidential disclosures but there was an additional element. An expired patent, not owned by plaintiffs, covered the product, a compressed cotton bath sponge, from which plaintiffs developed the compressed face cloth. Defendants claimed that they could have learned how to manufacture the face cloth from a study of the expired patent. "The fact

is that they did not," said the court. "Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment." 209 F.2d at page 495. During its discussion of the appropriate remedy, the court added, "[A]ctual experience demonstrated that the idea [for a compressed face cloth] was not so readily understood, even with the teaching at hand of an expired patent as to the compressing of sponges." 209 F.2d at page 499. The expired patent did not describe the product in question and the court in effect concluded that it did not reveal the secrets involved in making a compressed face cloth. In Shellmar Products Co. v. Allen-Qualley Co., 7 Cir., 36 F.2d 623, the court held that the plaintiff's product was secret even though it might infringe an existing patent, as the defendant was not aware of such a patent until the plaintiff's disclosures enabled the defendant to make an "intelligent search" for possibly infringed patents.

These courts thus found that the facts justified the conclusion that the design and manufacture of the product did not lose their secret character by the plaintiff's marketing the product or by the existence of a patent on a related product. Since the defendant took a shortcut and used the confidences rather than expend the effort necessary to discover the secret by purchase and analysis of the product or by a search for and examination of an expired or existing patent, he was held liable to the plaintiff. These cases go no further, however. They recognize that there may be instances where the disclosure is so clear that the facts will not support the continued existence of trade secrets as to the method of manufacture and design of a product once it has been placed on the market. Illustrative of such cases are Carver v. Harr, 132 N.J.Eq. 207, 27 A.2d 895, and Northup v. Reish, 7 Cir., 200 F.2d 924, cited in Smith v. Dravo Corp., supra. In denying complainants' demand for relief, the Carver court stated, 27 A.2d at page 897:

"In order for complainants to prevail, a substantial element of secrecy must exist so that, except by the use of improper means, third parties would have difficulty in acquiring the information needful for making the screens. Matters which are completely disclosed by the goods themselves are not secret after the goods are put on the market."

The Northup court in reversing a lower court judgment for plaintiff said, 200 F.2d at page 927:

"We do not mean to imply by our emphasis on the fact that plaintiff's 'secret' was only an 'analogous use' for sheets of embossed aluminum foil, that a 'secret' must be a patentable invention in order to be protected by equity against its unauthorized use by one to whom the secret has been disclosed in confidence. We are only trying to emphasize the fact that we are not dealing here with a secret process, machine or method of manufacturing, but only with a simple use which was necessarily fully disclosed to the public by the plaintiff when he marketed his oven liners."

See also American Gage & Manufacturing Co. v. Maasdam, 6 Cir., 245 F.2d 62, 64 ("Examination of the device itself completely disclosed the elements of its construction."), Skoog v. McCray Refrigerator Co., 7 Cir., 211 F.2d 254, and Dollac Corp. v. Margon Corp., D.C.N.J., 164 F.Supp. 41, 57.

Plaintiff says that this is not one of those cases. He urges that to produce a hinge with the same function as the ABC hinge it was necessary to make an engineering study of it like the necessary engineering study of the cargo carrying devices in Smith v. Dravo Corp., supra. This argument is based largely on the positioning of the pivot point of the hinge. To understand it a description of the hinge will be necessary.

The sash or "ventilator" is attached to the window frame by two so-called extension hinges. Each hinge is made

of two horizontal leaves one of which is attached to the horizontal member of the frame and the other to the face of the ventilator at a corner. Each leaf extends outside of the building for about three inches from the face of the frame. The two leaves are superimposed and a single rivet is passed through their ends forming a pivot on which the ventilator turns. When the window is opened outward, this extension feature enables the hinges, unlike the ordinary butt hinges, to leave a gap on the hinge edge of the sash through which a hand can be inserted to clean the outside of the glass. This extension feature was well known in the industry prior to the date of the alleged disclosure. A steel window which embodied it, the "Fenestra", was on the market and defendant had designed an aluminum one.

The ventilator of a casement window closes against a window stop which extends inwardly from the perimeter of the frame. If an extension hinge has its pivot point exactly in the plane which is perpendicular to the plane of the window stop and which intersects it vertically at the near edge of the closed ventilator, the ventilator will swing free of the window stop when opened. If, however, the pivot point is offset from that plane in the direction counter to the direction in which the ventilator is intended to open, the vertical near edge of the ventilator will jam against the windowstop and the ventilator will not open. Even though the hinge is designed to hold the pivot point in the proper place, inaccuracies in manufacture may result in offsetting it in the direction counter to the direction in which the ventilator is intended to open and thus causing a jammed window. Offsetting the pivot point in the other direction, however, is harmless so the ABC hinge has a slight offset in that direction to compensate for any possible inaccuracies in manufacture. Defendant's hinge has a similar offset.

The purpose of the offset was to compensate for anticipated inaccuracies in manufacture. The fact of the offset was apparent on inspection. Its function could not be impaired by exaggerating it. Hence the precise location of the pivot point was unimportant so long as it was offset. No engineering study of the model on the market was necessary to get the benefit of that ABC idea.

Another feature of the hinge that appears on the products of both ABC and defendant is the "spun" rivet which acts as the pivot. In the ordinary process of hammering or peening the narrow end of a rivet to form a head, the diameter of the shank is expanded with the result that it fits tightly in the hole. If an attempt were made to use such a hammered rivet as a hinge pivot, the expansion would preclude motion of the leaves on the pivot. An attempt to increase the size of the hole so that the expanded shank would not bind could not be successful because of the importance of exactly gauging the expansion so that the rivet would permit movement and still keep the leaves in proper position. Thus where it is desired to use the rivet as a pivot for moving parts a spinning device is used which forms the head without expanding the shank. Since the rivet was used as a pivot for moving parts the fact that it was spun must have been obvious to any manufacturer of casement windows without the necessity of engineering study. The spinning, like the offset of the pivot, was thus disclosed by placing the hinge on the market.

While plaintiff claims that the putty-retaining edges of the ABC hinge were an important part of its disclosure, no claim can be made that a precise study of the window on the market would have been necessary to successfully copy them.

I find that the features common to both windows were so clearly disclosed by the ABC window available on the market that they no longer constituted trade secrets. Each was a "simple device, widely circulated, the construction of which was ascertainable at a glance." Smith v. Dravo Corp., 7 Cir., 203 F.2d 369, 375.

Plaintiff's complaint will be dismissed on the merits with costs. The counterclaim for a declaratory judgment and for an injunction against the prosecution of any other suits based on a claimed appropriation of trade secrets is dismissed as unnecessary.

This opinion is intended to constitute findings of fact and conclusions of law but the parties may make such applications as they deem proper for any additional ones.

Settle judgment on notice.