SPEEDRY CHEMICAL PRODUCTS, INC. and Sidney Rosenthal, Plaintiffs-Appellants,

v.

The CARTER'S INK COMPANY, Defendant-Appellee.

No. 244, Docket 27260.

United States Court of Appeals Second Circuit.

Argued Feb. 21, 1962.

Decided July 2, 1962.

Julius Kass, New York City (Bandler & Kass, New York City, on the brief) (Robert Sylvor, New York City, of counsel), for plaintiffs-appellants.

Whitman Knapp, New York City (Root, Barrett, Cohen, Knapp & Smith, New York City, on the brief) (Robert F. Ambrose, New York City, of counsel), for defendant-appellee.

Before MOORE, FRIENDLY and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

This case arises from a complaint by Speedry Chemical Products, Inc. (Speedry) and Sidney Rosenthal, its president, seeking an injunction and an accounting against The Carter's Ink Company (Carter's) and alleging unfair competition and disclosure of trade secrets by Speedry to Carter in confidence, which disclosures were allegedly illegally obtained and wrongfully used by Carter to the damage of Speedry and Rosen-

thal. By stipulation the case was tried by the Court without a jury. After a full trial consisting of oral testimony, depositions and hundreds of exhibits, the United States District Court for the Southern District of New York, Wham, J.[1] dismissed the complaint. We affirm.[2]

Plaintiff Rosenthal is a citizen of the State of New York and plaintiff Speedry is a New York corporation. Carter's is a Massachusetts corporation. Jurisdiction is, therefore, based on diversity of citizenship, 28 U.S.C.A. § 1332. For a considerable time prior to 1956 Speedry manufactured and sold in the open market a refillable capillary action hand ink marking device known as "Magic Marker," consisting of a felt writing nib which continually absorbed ink from a saturated felt sponge encased in a small glass container. Carter's had been engaged for years in the production of ink and products using ink.

Carter's, having become interested in hand ink marking devices and being convinced of the superior qualities of Magic Marker, began negotiations with Speedry in September, 1956. Carter's purpose was to obtain a satisfactory licensing agreement to market Magic Marker under Carter's label. Toward this end representatives of Carter's opened discussion with Sidney Rosenthal, sole owner and president of Speedry. Carter's was interested in a licensing contract which would enable them to put the Magic Marker with Carter's label on the market, by January, 1957. After some preliminary discussions a meeting was set up in Cambridge, Massachusetts for September 24, 1956. Mr. Rosenthal met with certain of Carter's executives, and it was agreed that the only item of discussion would be the proposed licensing agreement. A second meeting was held on October 17, 1956. Carter's represen-

---

1. Of the District Court for the Eastern District of Illinois, sitting by designation.

2. Judge Wham having made a finding: "All witnesses who appeared before the Court were truthful to the best of their ability

taking into consideration the four-year lapse of time since the events being testified to"; we have made an independent examination of the entire record of this case prior to our decision to affirm.

tative at this meeting reported to Carter's, among other things:

In our search for the proper product to challenge this market three possibilities presented themselves:

1. Develop a product of our own.

2. Make a product like the Magic Marker but avoid their patents.

3. Secure patent rights from Speedry.

There were subsequent meetings and telephone conversations between Carter's representatives and Rosenthal. These discussions included considerable detail as to constructional features of Magic Marker and other details incidental to the proposed licensing agreement. At the morning meeting of October 29th, Speedry was represented by Rosenthal and his attorney. Carter's was represented by several of its executives and its attorneys. At this meeting discussion was continued and followed by a luncheon meeting and an afternoon meeting at Carter's plant where Rosenthal went into further detail. By this time the parties contemplated sale by Speedry to Carter's of all the material parts of the marker including the completed nib assembly, the felt, and the ink, with Carter's supplying other parts and its label and assembling the finished product.

In the meantime, Carter's patent lawyers had been studying Speedry's patent and subsequently concluded that it did not give adequate protection and, therefore, a licensing agreement would be of no use to Carter's. On January 11, 1957 Carter's notified Speedry of their conclusion.

Carter's, through research, experimentation, investigation, study and the assistance of an independent firm of design engineers, released to the general market its product "Marks-A-Lot" in April, 1958.

■ Appellants Speedry and Rosenthal brought this action for an injunction against, and an accounting from, Carter's, asserting unfair competition and alleged disclosure of trade secrets by appellants and subsequent use of them by Carter's. While there are precedents in this field, each case turns upon its own facts. There are, however, some guideposts. The right independently to discover and use a secret was recognized in England as early as 1743. Gibblett v. Read, 9 Mod. 459. There is a "property right" in trade secrets, which may be protected against those who acquire and use the knowledge thereof wrongfully. Ferroline v. General Aniline & Film Corp., 207 F.2d 912 (7 Cir.1953), cert. denied 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098 (1954). However, the discoverer of such secrets has no exclusive right against another who uncovers the secret by fair means, or against those who acquire knowledge of it without a breach of contract or of a confidential relationship with the discoverer, American Dirigold Corp. v. Dirigold Metals Corp., 125 F.2d 446 (6 Cir.1942); Nims, Unfair Competition and Trade-Marks, 4th Ed. p. 418.

■ Plaintiff's claim is correctly based upon "equitable principles" Becher v. Contoure Laboratories, Inc., 29 F. 2d 31 (2 Cir.1928); affirmed 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752 (1929). Except for matters of assignment and other related purposes, the word "property" as applied to unpatented secret inventions, discoveries and trade secrets generally constitutes "an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith" E. I. DuPont de Nemours Powder Co. v. Masland, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016 (1917). For example, the discoverer of a new process or trade secret who attempts to keep the process or idea secret has no exclusive right to it against the public, or anyone who discovers it by fair means, or against one who in good faith acquires knowledge of it without breach of contract or of a confidential relationship with the discoverer. American Dirigold Corp. v. Dirigold Metals Corp., supra; Cheney Bros. v. Doris Silk Corp., 35 F.2d 279 (2 Cir.1929), cert. denied

281 U.S. 728, 50 S.Ct. 245, 74 L.Ed. 1145 (1930).

■ In an action of this type there must be a showing of a confidential relationship between the parties, the disclosure of trade secrets and the use by the defendant of this secret information. Restatement of Torts, Section 757.

■ Basic to any action of this type is proof of the existence of a trade secret. Restatement of Torts § 757 adequately sets forth the rule:

"Secrecy. The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial, element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

■ Speedry's Magic Marker was on the market and available to the general public. The basic elements were disclosed in United States Patent No. 2,713,176. Both the marker itself and the patent had been examined by defendant's employees and attorneys. Subject to patent restrictions defendant was free to use any knowledge gained therefrom. Cheney Bros. v. Doris Silk Corp., supra; Canfield v. Blaw-Knox Co., 98 F.2d 805 (3 Cir.1938); Ellis, Trade Secrets, p. 323.

■ However, plaintiff claims that defendant set up a confidential relationship by the meetings in Boston, obtained the necessary secrets and used them to manufacture its product Marks-A-Lot. Defendant contends that no trade secrets were disclosed and its Marks-A-Lot was developed by independent research on its part. A clear cut issue of fact was presented to the trial court and we have independently examined all of the testimony and the hundreds of pages of exhibits plus the Magic Marker and the Marks-A-Lot. We find ourselves in agreement with the findings, conclusions and judgment of the trial court.

During September and October of 1956 several conferences were held between officials of Speedry and Carter. These conferences were for the purpose of making out a license contract whereby Carter could put the Magic Markers on the market with Carter's label by January 1, 1957. These meetings centered around proposed arrangements whereby Speedry would sell to Carter all the vital parts of Magic Marker—the completed nib assembly, the felt and the ink—with Carter supplying other parts and assembling the finished product. The record shows that all of the conferences were held within the framework of the pending proposed licensing contract. Representing Speedry at these confer-

ences was plaintiff Rosenthal, a law school graduate, and his attorney. The trial judge made the following findings concerning these meetings:

12. On the afternoon of October 29, 1956, Mr. Rosenthal attended a preparatory meeting at the Carter's plant. There was then no purpose on Carter's part to obtain any disclosures from Rosenthal that Carter's was not entitled to receive under the circumstances that then actually existed in connection with the still pending proposed licensing contract.

13. Rosenthal, a shrewd, wise and experienced businessman, carefully refrained from giving Carter's any information that would be useful to Carter's for any purpose other than for assembling the Magic Marker under Carter's label and putting it on the market in a manner least calculated to disturb Speedry's established industrial market.

14. In view of the nature of the proposed arrangement, it was unnecessary for Rosenthal to make disclosure of any secrets of manufacture, structure or the ink formula, and no disclosure of such secrets was made.

■ ■ It is true, as plaintiffs contend, that it is not necessary to show an express agreement to hold in confidence and not to use trade secrets obtained as the result of a confidence and not to use trade secrets obtained as the result of a confidential relationship. Schreyer v. Casco Products Corp., 190 F.2d 921 (2 Cir.1951), cert. denied 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952); Hoeltke v. C. M. Kemp Mfg. Co., 80 F.2d 912 (4 Cir.1936), cert. denied 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395 (1936). During the negotiations for the license agreement such a confidential relationship existed. See Schreyer v. Casco Products Corp., supra. On the other hand, plaintiff Rosenthal and his attorney were fully aware of the fact that they were being questioned within

the framework of the proposed license agreement. Rosenthal was characterized by the trial judge as "a shrewd, wise and experienced businessman." His attorney was actually drawing up the proposed licensing agreement. Carter's representative had pointed out that a "snag" had developed in the negotiations for the agreement but everything was expected to work out satisfactorily.

Defendant's attorneys and employees had examined the Magic Marker and the patent. Whatever information was ascertained from their examinations was already in the public domain. American Gage and Manufacturing Co. v. Maasdam, 245 F.2d 62 (6 Cir.1957); Conmar Products Corp. v. Universal Slide Fastener Co., 172 F.2d 150 (2 Cir.1949); Picard v. United Aircraft Corp., 128 F.2d 632 (2 Cir.1942), cert. denied 317 U.S. 651, 63 S.Ct. 46, 87 L.Ed. 524 (1942). While defendant could use this information with impunity, limited only by the restriction of the patent involved, it would be liable if it used trade secrets divulged by plaintiffs rather than the information in the public domain. Schreyer v. Casco Products Corp., 97 F.Supp. 159, 168 (D. C.Conn.1951), affirmed as to unfair competition issue 190 F.2d 921 (2 Cir.1951), cert. denied 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952); Smith v. Dravo Corp., 203 F.2d 369, 375 (7 Cir.1953); Franke v. Wiltschek, 209 F.2d 493, 495 (2 Cir.1953). In this case no trade secrets were divulged.

In a recent case involving alleged disclosure of trade secrets during negotiations for a sales contract the Seventh Circuit concluded:

"The learned District Judge found that the dealings between plaintiffs and the Milwaukee plant were typical of those between a prospective vendor and vendee. He further found that Harvester's Milwaukee employees did not distribute copies of plaintiffs' drawings but prepared their own drawings which were different in some respects from those of plaintiffs'. The record shows ample support for the District

Judge's conclusions that Harvester violated no confidential relationship and that Harvester did not become unjustly enriched at plaintiffs' expense." Saul v. International Harvester Company, 276 F.2d 361, 365 (7 Cir.1960).

While little difficulty is encountered in cases where secrets were obtained from employees or agents of plaintiffs in trade secret cases, all other trade secret cases turn on the facts of each case. In such cases the issues are whether actual trade secrets were given and whether they were used.

Cases relied on by the plaintiffs are restricted to the facts and are clearly distinguishable from the facts in this case. For example, in Franke v. Wiltschek, supra, the defendants were salesmen and the court found that plaintiff had revealed manufacturing details which they could not have otherwise discovered, concluding also that it was doubtful whether defendants in good faith even intended to sell plaintiff's product. In A. O. Smith Corp. v. Petroleum Iron Works of Ohio, 73 F.2d 531 (6 Cir.1934), modified 74 F.2d 934 (6 Cir.1935) defendant obtained trade secrets from an engineer formerly employed by plaintiff under a contract not to reveal such secrets.

The District Court in Schreyer v. Casco Products Corp., supra, said at page 168 of 97 F.Supp.:

"It is true that matters which are completely disclosed by goods on the market are not trade secrets. Mycalex Corp. [of America] v. Pemco Corp., D.C.Md.1946, 64 F.Supp. 420. Relying on this proposition, the defendants contend that all the information revealed by the blueprints and blanks could have been ascertained by careful analysis of the Steam-O-Matic iron which was obtainable on the market. By measuring the component parts, they say, blueprints could have been prepared and the most efficient productive method deduced. The fact remains, however, that the defendants took unwarranted advantage of the confidence which the Schreyers reposed in them and obtained the desired knowledge without the expenditure of money, effort and ingenuity which the experimental analysis of the model on the market would have required. Such an advantage obtained through breach of confidence is morally reprehensible and a proper subject for legal redress. See A. O. Smith Corp. v. Petroleum Iron Works Co., 6th Cir., 1934, 73 F.2d 531."

The applicable decisions of this Circuit were carefully analyzed in Judge Dimock's opinion in Speciner v. Reynolds Metals Co., 177 F.Supp. 291 (S.D.N.Y. 1959), aff'd per curiam 279 F.2d 337 (2 Cir.1960). In Speciner plaintiff claimed that information concerning the construction and design of a hinge and other construction details on a casement window had been divulged during a confidential relationship. The Court, however, concluded that "the features common to both windows were so clearly disclosed by the ABC window available on the market that they were no longer constituted trade secrets" (177 F.Supp. at 296). See also: American Gage and Manufacturing Co. v. Maasdam, supra; Northup v. Reish, 200 F.2d 924 (7 Cir. 1953).

After the meetings between Carter and Speedry, Carter concluded that the license contract was not feasible and so notified Speedry. Carter was faced with a choice of attempting to put out a copy of Speedry's product without infringing the patent or to start its own program of research and experimentation. The record, including testimony and voluminous exhibits shows that Carter chose the latter course. Intensive research was conducted and an independent firm of design engineers was employed.

As a result of this Carter brought out its own product "Marks-A-Lot" in April of 1958, some eighteen months after the above mentioned conferences with Speedry.

In Mitchell Novelty Co. v. United Manufacturing Co., 199 F.2d 462, 466 (7 Cir.1952) Chief Judge Major stated:

" * * * The District Court found, and we think appropriately:

" 'Any alleged disclosure made by Beck to Durant during the several conversations had between Beck and Durant were merely vague or general suggestions or hints, such as are usually made by operators as a result of their observation of commercial amusement devices or of testing games on location, and were of no novelty or specific application.'

This appraisement of Beck's alleged disclosure to Durant is further borne out by the fact that defendant's engineers spent several weeks in its shop developing a game which allegedly embodies the idea which Beck claims to have originated, all of which tends to show that Durant obtained from Beck no idea in concrete and usable form. Otherwise, there would have been no occasion for weeks of experimentation in its development."

Marks-A-Lot and Magic Marker are similar in many respects and yet different in other ways, both structurally and in materials used. There are features common to both Marks-A-Lot and Magic Marker such as the rectangular cut felt for the nib and sponge, the circular orifice and the dimples to secure the nib. All of these were revealed by examination of Magic Marker. Many features of Marks-A-Lot were the result of Carter's independent research and experimentation such as the type of ink to be used, the production and assembly of the product, type of felt and sponge to be used, provision for the intake of air and the use of extruded aluminum rather than glass. The record amply supports the trial judge's findings that the aspects of similarity are observable by inspection and therefore in the public domain. Similarly, the other features of Marks-A-Lot are the result of Carter's own research and experimentation.

Speedry's final claim was that Carter used certain business information obtained from them. This is difficult to understand in the light of the fact that Carter's product did not reach the market until eighteen months after the alleged disclosures. Then, too, there is the positive testimony of Carter's Market Research Manager as to work done by Carter to arrive at the market price for its product prior to release on the market. Mitchell Novelty Co. v. United Mfg. Co., 199 F.2d 462 (7 Cir.1952). We find no merit in this claim.

The judgment is affirmed.