**FEDERAL WELDING SERVICE, INC.,**
Plaintiff,

v.

**Orestes A. DIOGUARDI, Jr. and Vincent E. Dioguardi, doing business as Greenpoint Casket Company, Defendants.**

Civ. A. No. 18607.

United States District Court
E. D. New York.

June 10, 1960.

Booth, Lipton & Lipton, New York City, for plaintiff; Harold L. Lipton, New York City, of counsel.

Lichtig, Copland & Greenfield, New York City, for defendants; Max M. Greenfield, New York City, of counsel.

BYERS, District Judge.

The subject matter of this cause is the legal relationship between the parties between 1952 and 1957, shortly after which the litigation was started. The plaintiff manufactured and sold to the defendants during those five years, metal boxes or containers for caskets, and the failure of the defendants to pay for those which were delivered between September and December 1957 and for others which were on hand and ready for delivery, and parts, of the total value of $12,956.-53, constituted the plaintiff's cause of action.

It was agreed at the trial that the said sum was due to the plaintiff, and accordingly judgment in that amount was agreed to.

Thus the controversy was made to turn upon the counterclaims asserted by defendants and denied by the plaintiff. Adjudication is required as to such matters.

The defendants allege,

A—infringement of their patents No. 2,674,024 and No. 2,812,966,

B—breach of trust and confidence on the part of plaintiff, and

C—unfair competition.

An examination of the record and exhibits indicates that the alleged breach of confidence requires examination at the outset, since its precise elements will largely govern a conclusion as to the balance of equities.

### Background.

The plaintiff, prior to 1952, was engaged in producing, among other steel products and such, boxes or containers for caskets. It also rendered services in welding steel and performed other tasks in the general field of steel working.

The defendants—a partnership—for many years prior to 1952, had been selling equipment and supplies used in burials, to undertakers and to other dealers. They also made hardwood and cloth-covered caskets, and dealt in such articles made by others.

During the period immediately prior to June 1952, Orestes A. Dioguardi, Jr., who was defendants' main witness, concerned himself with the problem of procuring and marketing such a metal container for use in cemeteries where three interments in one grave were permitted, subject to restrictions that had to be observed, namely that the top one should be three feet below the surface of the ground, and the grave itself should be nine feet deep. Obviously this restricted the available vertical space for three interments to six feet, or 72 inches.

The need then was for containers of twenty-four inches in height. That need was created by the regulations of cemeteries, which were well known to all who had occasion to make use of their facilities. There was nothing secret about it.

Orestes became convinced that wooden boxes could be supplanted by metal ones (concrete boxes had been used, but could not be made within the twenty-four inch limit) and that such an article, if made in a form that was pleasing to the eye, could be developed as a profitable item for sale to funeral directors, and to other dealers.

He interviewed Brick, the plaintiff's president, on the subject in June of 1952, and the outcome of their conversations was the creation of a business arrangement which will be discussed, that began in that month and that continued, as above stated, until the end of 1957.

Orestes applied for a patent on his so-called vault on August 29, 1952 which was granted April 4, 1954; and on certain attached hand-grips, on March 4, 1954 which was granted November 12, 1957. Those are the patents which the plaintiff is charged to infringe.

The plaintiff began to manufacture and sell for its own accounts, a twenty-four inch steel vault in 1955, but abandoned the model, and later made and sold its Triad vault, which is the alleged infringing device.

Its conduct in so doing is the alleged unfair competition, which is largely involved in the alleged breach of confidence. Thus the defendants' causes B and C are so closely related that they can be considered together.

The use of the word "vault" to describe the burial case for a casket, is in keeping with the modern national tendency to employ as a selling argument high-sounding and picturesque nomenclature without regard to the teachings of etymology. It fosters a spirit of exaggeration and inaccuracy, and such has been its effect in the testimony and advocacy at bar. While a box has sides and a top and a bottom, a "vault" has "side walls," and a "top-wall," or "dome," although we are talking about a metal box that is about 7 feet long, 2 feet high and about 2½ feet wide.

The opinion in Application of Roth, Cust. & Pat.App., 275 F.2d 743, which appeared after briefs in this case had been filed and which dealt with a patent for "Crypt Building Structure," contains the following:

"* * * but in this case it was, to say the least, no remarkable discovery to grasp the fact that cemeteries were getting crowded and that it would be desirable to save space. Both the problem and the means were obvious."

While the foregoing applied to a structure called a crypt for the reception of caskets, the principle is thought to be the same in the case of a grave in which three interments are permissible.

It has been found necessary therefore to resort to a somewhat astringent process in construing the evidence, and in weighing the arguments, in order to arrive at such a decision as the facts seem to render necessary.

Turning now to the cause for breach of trust and confidence, the evidence requires careful analysis:

### The original agreement.

Since there is no document containing the terms of the contract, the requirement is to spell it out from what Orestes and Brick testified to; from such written correspondence as has been produced; and from the conduct of the parties to the extent that it may seem to be consistent with one theory or another as to what they probably intended when they established their initial relationship.

It is common ground that Orestes stated to Brick that he had "something that was very important to us, (defendants) that if I divulged anything that I had in mind, could I have his trust and confidence that he would not divulge any of my research that I had put into this— my thoughts."

Brick's testimony is generally to this effect. Also: "He gave me no idea of what he had in mind until after I had made a promise to do so." Clearly this means that he gave his promise to keep confidential Orestes' ideas and thoughts, without knowing what they would turn out to be.

Then it was that Orestes imparted to Brick his idea that a metal vault having a height of twenty-four inches, to be constructed as he visualized it, could be a profitable article of merchandise for Brick to make exclusively for Orestes, and for the latter to sell.

Orestes further explained that it was to be an open top steel vault, (as distinguished from an air-seal, or an open end box) that would have eye appeal and flexibility. His testimony is:

"I said, 'This is my idea which you are to regard as a secret. It is a 24-inch high top vault, open top, with a flat surface, with hand grips to extend from—I will use the word "horizontal"—maybe I did not use it at that time—to extend from the top portion of the vault, that would house some sort of a locking device, that would have to be shaped with

the eye appeal, to be able to sell it as a quality piece of merchandise other than the ordinary run of square boxes.' "

The foregoing is not contradicted by Brick.

The court understands the eye appeal and hand grips to refer to the configuration of the top element of the vault. The hand grips were supplied to fit the top in place, and served no function in the lifting of the box. That was accomplished by the use of handles at both ends.

The eye appeal was promoted by the shape of the top, which was not flat for its entire width. There was a flat or horizontal center section (about 15 inches in width) the outer parts of which for their entire length inclined downward so to engage the sides at an angle which has not been clearly stated.

Thus a sectional view of the top would reveal a rectangle, the upper and lower members of which would be parallel, the top being shorter than the bottom; the side panels of this were equal for they engaged the sides of the box in the same horizontal plane. Those panels contained the four hand-grips, which were so disposed on the panels that they constituted supporting elements at the same level as the center of the box, whereby a sustaining force was present as to the middle and top vaults, as though the top of those boxes were flat for their entire width.

Seemingly it was the avoidance of a completely flat top of the vault which furnished the eye appeal, plus the position and configuration of the hand-grips.

Probably that quality, if it exists at all, is presented only in connection with the sale to funeral directors of what Orestes describes as an article of merchandise. It should be said in parentheses, that these steel boxes have an appropriate metallic paint finish.

The mental concept of such an article was that of Orestes, and it is so found. He did not design it however, in the sense

that he portrayed to Brick the vault as it was later embodied in the sketches which Brick made, and forwarded to Orestes for his approval; that was prior to turning out the first sample (See defendants' Exhibit C, the invoice of June 16, 1952). The date is of importance as will be seen.

There were minor changes made at the request of Orestes, and thereafter the plaintiff manufactured and sold to the defendants the specified product in substantial volume.

In order to visualize the precise engagement into which the plaintiff entered, attention must be given to a letter written to the defendants by the former, dated June 3, 1952, being defendants' Exhibit F. At the taking of his pre-trial deposition, Orestes did not recall receiving it, but at the trial his memory was different. He then recalled that it had been delivered to him in person by Brick, but that he refused to agree to its terms, which he said were ridiculous. He testified that he returned the letter to Brick. The latter's testimony at the trial was that Orestes never agreed to the terms of the letter, or disagreed.

In material part, the letter reads:

"This letter is for the purpose of giving you our written guarantee that we will not make, for any person or firm except yourselves, a 12 gauge steel, open top burial vault with a height of 24″ or less, unless some one or more of our competitors start making similar vaults and selling them, either to you or to other persons or firms, in which case we reserve the right to meet competition. * * * We reserve the right to make and sell other styles of open-top vaults or boxes which would not be covered by the above definition."

In view of the unsatisfactory nature of the testimony as to the finality of the plaintiff's position as above outlined, the letter itself cannot be relied upon as the basis of a finding that the actual contractual terms of the relationship en-

tered into, was as therein stated. At most, the testimony shows that thus early in their dealings the parties were in disagreement as to the restrictions that would govern the plaintiff in the pursuit of its business affairs. The occasion called loudly for a precise written contract to resolve a misunderstanding that may have constituted a failure of the minds of the parties to meet.

The court must deal with a situation that was permitted to develop by two mature business men during the ensuing five years, in an atmosphere that from the inception of their dealings, was lacking in fundamental clarity, and which seemed destined to create just such a controversy as has arisen.

Their subsequent conduct must be consulted on the theory that they may have adopted a practical construction of what was essentially a contractual relationship, to which resort may be had for the purposes of this decision.

The course of business between the parties continued without apparent incident for nearly three years or until about July 28, 1955, when plaintiff wrote Exhibit R, by reason of the appearance on the market of a 24″ air seal vault made by Perfection,

"My (Brick's) customers were becoming very insistent that we do something about this 24-inch-high vault. They complained that it was almost impossible to get them from Greenpoint Casket Company. They had bought some from Greenpoint Casket Company, and they were charged a very high price for them, they told me."

This will be seen to reiterate in substance part of Exhibit F. Then in December of 1955, plaintiff made and sold its Triad vault which is said to infringe defendants' patents (one or both).

Orestes knew of this development, but continued to purchase from plaintiff the vault in accord with the original sample as modified, to the extent of almost, if not quite, 2,000 vaults, through the month of December, 1957.

It was only as the result of plaintiff's suit to recover the agreed purchase price, that the present counterclaims were made.

There are two other interesting exhibits, being letters written by plaintiff to defendant June 24, 1954 (Exhibit K) and by plaintiff to Bridge Casket Co., April 15, 1955 (Exhibit P):

"* * * Although I have tried to get your approval of some means whereby I could sell 24″ high vaults to other casket houses, I have told all of them that in the absence of such approval I was not free to fill their orders for such vaults, and I don't think that it has done us any good either, especially with Boyertown. * * * (Ex. K).

"For a couple of years we have been making such a vault for Greenpoint Casket Company, the design having been originated and patented by them. This vault is open top design, with a rubber gasket between the lid and the body of the vault. In view of the fact that Greenpoint have a patent on this design and that, in addition, we have agreed not to make it for anyone else, it would be impossible for us to furnish you with such vaults.

\* \* \* \* \* \*

"If you have occasion to require a vault of 24 inches height, I would suggest that you get in touch with Mr. Orestes Dioguardi at Greenpoint Casket Company and he will make arrangements to furnish them to you." (Ex. P).

Exhibit K was over a year earlier than Exhibit R, and Exhibit P states that as to the Greenpoint vault "the design having been originated and patented by them * * * in addition we have agreed not to make it for anyone else * * *."

The plaintiff seems to have been consistent in its attitude that it was under a duty not to make or sell to others, the Greenpoint vault as described in Exhibit F.

The conduct of defendants in continuing to buy from plaintiff during the year and a half ended in December 1957, is consistent with an acquiescence in plaintiff's manufacture and sale of its Triad vault, now in suit. That in turn is consistent with an unwillingness to enter into a legal contest with plaintiff over the latter's statement of the original understanding as set forth in Exhibit F on June 3, 1952.

This is seen to be the conduct of the parties which places their practical construction upon the nature of their original contract.

The finding is, that the undertaking given by plaintiff to the defendants to refrain from making or selling the device first described by Orestes to Brick, is correctly stated in Exhibit F, and that the parties continued to so recognize down to the filing of this suit.

It is inaccurate to describe the original conversation between Orestes and Brick as the imparting of a trade secret. Orestes neither possessed nor practised a trade secret as to a product, or a process, nor even a blue-print of either. He needed the services of some one to make sketches or drawings that would delineate his ideas for an article of merchandise. The sketches were forthcoming from Brick, who thus contributed an important element to the final design; thereafter manufacture and sale proceeded of the approved model.

The plaintiff has gone on record that it refuses to make and sell to others the article that Orestes first described to Brick, which is now deemed to be a continuing undertaking.

As has been said, there was nothing secret about the 24 inch requirement, and the details as to how that could be met in the manner that Orestes desired, involved a box or casket container, with means to use it. As to whether those means were known to the art, will be considered in connection with the patent aspects of the case.

The manufacture and sale by plaintiff of its Triad vault is found not to be in violation of such confidential information as was imparted to Brick by Orestes Dioguardi at their original interview.

A word should be said concerning the cases cited by defendants on the subject of unjust enrichment on the part of one who comes into possession of a trade secret, sometimes, but not always, by unethical practice, and seeks to capitalize it for his own profit. Shellmar Products Co. v. Allen-Qualley, 7 Cir., 36 F.2d 623 and 7 Cir., 87 F.2d 104; Schreyer et al. v. Casco, 2 Cir., 190 F.2d 921; Franke v. Wiltschek, 2 Cir., 209 F.2d 493; Trenton Industries v. A. E. Peterson Mfg. Co., D.C., 165 F.Supp. 523, and Speciner v. Reynolds etc., D.C., 177 F.Supp. 291.

These cases involve a variety of circumstances in which there has been revealed the entrusting by the complaining party to another, of a tangible thing in condition for reproduction, not the mere concept of a desirable result. All that could be thought of as a crude model of what Orestes visualized as his thoughts, was a cardboard shoe box he used for the purposes of demonstration during the original interview between him and Brick.

I do not mean to suggest that an idea standing alone may be freely purloined and thus turned to the financial advantage—the unjust enrichment—of one to whom it is entrusted under a promise that it will be held in confidence; but that in each of the cases upon which defendants rely, there was something more involved than imparting in inchoate form a purpose that required for its fulfillment the skill in design and mechanical understanding that Brick was required to bring to bear. To the final result, he made a contribution, but that did not absolve him from his original recognition of the confidence reposed in him; the complete design embodied something which had not been imparted to him by Orestes. Thus if the obligations discussed in Schreyer and Franke were to be held to apply to this case, a new basis of liability would have to be recognized. The reasons for not deeming the circum-

stances appropriate for such an extension are:

(a) This plaintiff has recognized that reproduction of the defendants' vault is not open to it, by reason of their initial arrangement.

(b) The precise restriction assumed by the plaintiff in the conduct of its business in making and selling burial vaults, was disputed between the parties as has been seen, from the very outset of their dealings. The least that can be said for their mutual forbearance to insist upon a clarifying written contract, is that they were willing in June or July of 1952 to let the future take care of itself. The continued purchases by the defendants from and after knowledge in December 1955 of plaintiff's asserted freedom to make and sell its Triad vault, was not consistent with a belief that its confidence was thereby being betrayed. The refusal to pay for the sales and deliveries during most of the ensuing period and until this suit was brought, of the vaults that plaintiff made for defendants, was not stated to be according to any testimony, the equivalent of instituting litigation in order to vindicate an asserted cause of action.

(c) The plaintiff's Triad vault is different in design from the defendants "Jovarde" vault and therefore its production and sale do not affect the defendant's rights. This reason cannot be effectually discussed except in connection with the issue of infringement of the patents in suit.

(d) Whether that which Orestes imparted to Brick was indeed a trade secret at all, is open to serious question. Judge Dimock in the A.B.C. case (Speciner) quoted the Restatement (Torts, § 757, Comment b) and his lead will be followed, thus:

"*Secrecy.* The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret."

As has been said, the 24 inch requirement for casket containers was no secret;

the method of meeting that requirement which Orestes evolved will be seen to have enlisted much that was in the public domain.

█ It results that so much of defendants' cause as asserts breach of trust and confidence and unfair competition, is deemed to have failed of proof, and it is so found; but the issue of alleged infringement requires separate examination.

### As to defendants' patents.

Defendants urge that plaintiff, being a licensee under these patents, is estopped to deny their validity. To this it is answered that no license has been sought to be shown after the patents were issued.

Clearly the plaintiff was not in the conventional position of a licensee who paid royalties in order to sell or use the patented product, and who therefore has been held to be estopped to question validity.

Moreover, the defendants have asserted these patents in their counterclaim, thus assuming a certain burden of proof which the Court is required to inquire into, as an incident to adjudication.

The first of these is No. 2,674,024, granted April 6, 1954. It is for "Vault Structure." The recital refers to the known three casket limit in a single grave, and the height restriction so involved. The objects of the invention as proclaimed are sturdy fluid-tight structures; means to grasp the lid which will not increase the height; a locking mechanism to be operated from hollow handles which are substantially level with the top; locking and unlocking the lid; (*Note:* top of box) use of thin sheet metal to construct the article; inner reinforcement; easy removal of lowering straps; coloring the metal container.

The specifications as illustrated by the patent drawings are largely devoted to details of construction, the engagement of the top to the sides, and latching means to preserve that relationship, which do not require recital.

Reference to the handle is important, bearing in mind that what is meant is the hand-grip for manipulating the top, not the end handle of the box itself. The language is:

"As can be seen from the drawings, each handle 31 consists of a substantially flat top piece 35 which is substantially level with the top wall 36 of the lid 13.

"Handle 31 has further downwardly extending lugs 37 and 38 which are spaced from each other and fixed to the downwardly slanting wall portions 36a of the lid, as by welding. * * *

"The uppermost surfaces of the top walls 35 of the handles, which are arranged on the slanting lid surface side portions are flush with the central uppermost surface wall 36 of the lid. Thus, the handles 31 cooperate with the top wall 36 and form an enlarged bearing surface for supporting another vault 10a, * * * which may be stacked thereon."

The claims in suit are:

"1. A burial vault and like structure comprising a top wall, upright side walls, said top wall including a substantially horizontal wall portion and inclined wall portions diverging from said horizontal wall portion toward said upright side walls, and handle means disposed adjacent said inclined wall portions at predetermined spaced locations of the latter, said handle means including each a top piece extending substantially level with said horizontal wall portion, whereby the bearing area of the latter is enlarged for supporting another vault in superposed position thereon.

"2. A structure according to claim 1, wherein each of said handle means comprises spaced lugs extending at opposite ends of said top piece to the respective inclined wall portion, to which said lugs are attached."

With regard to the patentable invention, no testimony has been offered for defendant (who relies upon the presumption of validity) save that of the patentee himself.

On this subject, he said:

"A. * * * I believed I was inventing an open-top steel vault with a hand guard (hand-grip) that would be horizontal with the top part of the vault and that would house a locking device so that the hand guard could be used for lifting the cover off the vault. The housing of the locking device would not exceed the 24-inch height, and it would be suitable for stacking another vault on the top of it." (Record, p. 219.)

This then should be taken as the disclosure of the patentable invention, and the claims are to be compared with it.

It will be observed that the claim is for:

A. Such a vault having a center horizontal section from which extend sloping portions thereof to the sides.

Such a form of top construction is shown in Fig. 2 of Canedy No. 2,058,130, granted October 20, 1936. See also the Marion vault, Exhibit 13.

Moreover the patentee was asked on cross-examination:

"Q. * * * Now, is there anything about a substantially horizontal wall portion that is new? A. No.

"Q. And is there anything new about an 'an inclined wall portion diverging from said horizontal wall portion'? A. No." (Record, pp. 283-4.)

Thus it is clear that patentable invention did not reside in this part of the claim.

B. " * * * and handle means disposed adjacent said inclined wall portions at predetermined spaced locations of the latter * * *."

The word "adjacent" is an unfortunate choice. It means (Oxford Concise):

"Lying near, contiguous."

These handle means are placed *on* the inclined wall portions, not *near* or *contiguous to*.

This part of the claim continues: "said handle means including each a top piece extending substantially level with said horizontal wall portion, whereby the bearing area of the latter is enlarged for supporting another vault in superposed position thereon."

Did this placement of the hand-grips constitute patentable invention, having in mind that handles on the lid were not new (Record, p. 299)?

To answer this question it is necessary to realize that since for eye appeal purposes, the top of the lowest and intermediate boxes in a three-tier arrangement was thought to be more attractive in appearance if it were not flat for its entire width, a support for the full width bottom of an upper burial case was necessary to prevent a tendency of the latter to tilt. Therefore a shoulder or prop was needed to function in the place of the support which a full width box would have provided.

It did not require inventive talent to perceive that, just ordinary common sense. Moreover it was taught by Etten, No. 2,611,946, filed April 10, 1946, granted September 30, 1952.

Since the only base to support such a prop was the inclined portion of the top, the selection thereof was inevitable; there was no alternative.

Thus the matter comes down to whether it was patentable invention to combine the hand-grip which was needed for lifting and removing the top, with the necessary prop or support.

Claim 2 defines the hand-grip as comprising a top piece and spaced lugs (i. e., supports for that).

As thus narrowed, the possibility of patentable invention is seen to be minimal. The merger of the hand-grip into the prop or support promoted economy in manufacture; the mere union of function thus accomplished, while ingenious, was a matter of mechanical skill not rising to the level of patentable invention, as this Court understands the teaching of the case of Great A. & P. Tea Co. v. Supermarket, etc., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.

Not even the exigencies of advocacy can justify ascribing to this patent the filling of a "long felt want." Wooden casket cases of 24 inch height were in use for many years prior to 1952, as also were such made of metal. The testimony makes this clear.

The defendants' patent is for an article of merchandise designed to supplant the former boxes, and so contrived as to constitute an article which could be advertised and sold on a profitable basis.

There is no testimony to the effect that the world had been waiting for this particular development in the field of mortuary enterprise.

■ It is thus found and concluded that Patent No. 2,674,024 is invalid for failure to disclose patentable invention.

The second patent is No. 2,812,966, granted November 12, 1957 for "Closure Means for Burial Vaults."

The object is to provide means for a sturdy handle structure connected to the vault and concealing vault locking means without impairing the handle structure; providing a plurality of handles spaced apart to enlarge bearing surface (*Note*: This is explained above), so that the tiering of vaults shall not impair access to the several locking means; noiseless locking means; tight sealing of the vaults; a zinc or other lining, and rapid closing of vault.

The drawings disclose a vault like that of the first patent except that the slanting parts of the top appear to present a breaking rather than a constant line. The handle grips are shown, their tops being "substantially level with the center of the top wall * * *."

The handle grips "or housings" are described and their attachment to the top wall of the vault.

The elements of the locking means are described with reference to the drawings, and their operation; also their position within the hollow handle. In summary the disclosure is said to embrace the vault structure "having an open-ended vault body, a cover * * *, a plurality of hollow handle means fixed in spaced relation on the surface of said cover (*Note*: meaning of course the top) to facilitate placing the latter over said open-ended vault body (*Note*: this probably means open-top), respective elongated strut means extending from said vault body to said cover and terminating in said hollow handle means, and means within said handle means (*Note*: this refers to the hand-grips) engageable with said strut means for maintaining the latter in applied position to said cover, whereby the latter is tightly retained on said vault body."

Claim 3 is in suit:

"3. In a vault provided with a body part and a cover part having downwardly sloping portions and having further plate-shaped hand grip means secured to said cover part in overlying relation to said sloping portions for manipulation of said cover part relative to said body part; complementary latch portions, one of said latch portions being disposed on one of the vault parts and being provided with a hook, (*Note*: see Nos. 25, 31, 32, 33 and 34, Fig. 3) the other latch portion being arranged on the other part of said vault and forming a bolt for locking engagement with said hook * * *, both said latch portions extending, respectively, exteriorly of said body part and said cover part for connection with each other, at least one of said complementary latch portions being located for pivotal movement in underlying relation to said hand grip means to facilitate bringing said complementary latch portions in latching engagement when the hand grip means is engaged."

Again recourse should be had to the patentee's own concept of his patentable disclosure:

"The Court: No, please tell us—you are the patentee—what do you conceive your patentable invention to be?

"The Witness: The patentable invention on this patent, No. 2,812,966 is a hinge type clamping locking device.

"The Court: Hinge type clamping locking device? Is that it?

"The Witness: That is right. It is a—

"The Court: Well, I think we can tell what it is by looking at the patent.

"Now, in what respect is that structure different from any prior structure of the same kind?

"The Witness: This structure is housed inside the hand grip. In other words, the—one part of the hinge is welded to the body side of the vault, and the bolt or the clamp is welded on a sliding affair underneath the hand grip, and when the hinge part is brought up to house the bolt, then it is cranked closed to give it a clamping effect, drawing the cover down to the body side.

"The Court: Well, is it the position of the device rather than the construction of the device that you rely on?

"The Witness: The position.

"The Court: But not the construction?

"The Witness: Not so much the construction.

"The Court: Well, is it novel at all in construction?

"The Witness: Only that one part of it is housed on the body side and the other part of it is housed underneath the hand grip, and when you close it the dirt can't get at it.

"The Court: Yes, but that means that it is the position of the device that you rely on, and not the construction of the device, the several members of the device. Is that true?

"The Witness: That is true.

"The Court: I am not trying to force a thing on you. I am simply trying to learn.

"The Witness: That is true, your Honor.

"The Court: That it is the position, and not the elements of the locking device structure?

"The Witness: That is right, your Honor.

"By Mr. Lipton:

"Q. And am I correct in saying that the essential part is that it is concealed underneath the lid? A. That is one—that is it—that is a portion of it.

"Q. Underneath the hand grip? A. The hand grip.

"Q. Right? A. Yes.

"Q. In other words, the position his Honor was referring to, and which you agreed to, is the fact that it is hidden underneath the hand grip? A. That is right.

"Q. So that it is concealed? A. That is right."

Thus it is the placing of the latching device within the hand-grip itself (i. e., under No. 18, Fig. 1) that is deemed to constitute the patentable disclosure. Since two element latching devices and their engagement is not new, (Canedy No. 2,058,130 granted October 20, 1936) the quoted explanation from the patentee's testimony is convincing.

Because it is the position of the locking device and not its constituency that is relied upon, the present problem is greatly simplified.

There were but two possibilities presented to the designer of the device: placing part of the latching mechanism within the structure of the hand-grip, or exterior thereto; the selection of either position was not patentable invention, but merely a choice of the most expedient site for convenience of operation. The top of the vault had to be held in ultimate engagement with the rest of it, whereby a two element latch of tested efficiency was found to be requisite; nothing of patentable invention resided in the choice of an available position.

 Thus it is found that patentable invention is not disclosed in Patent No. 2,812,966.

The issue as to infringement is also to be decided on the assumption that as to validity of either or both patents, this Court has reached an erroneous conclusion.

As to patent No. 2,674,024 the plaintiff's structure is found not to infringe, in that the top of the vault is not flat, or "substantially horizontal" within the teaching of this patent. Plaintiff's Exhibit 10, a photograph of plaintiff's vault, discloses a ridge in the center of the top which extends for the full length thereof, which is not less than an inch high.

The presence of this ridge produces a tendency to tip on the part of the second and top vaults in a three-tier arrangement, which is probably reduced by a partial lowering of the ridge from the combined weight of the top three feet of earth and the vaults which are being supported. So much is based on inference in the absence of direct testimony, and depends for its validity upon factors not in evidence. If it be true, the fact remains that as constructed and sold, the Triad vault does not infringe the defendants' said patent, as to the form of its top.

Concerning handle means themselves, that of the plaintiff is strikingly dissimilar to the defendants' in construction and appearance. In function, however, there is no perceptible difference.

The respective top pieces of the hand-grips are readily to be distinguished

when Claim 2 is compared to the plaintiff's version of such a device, by the absence in the latter of spaced lugs forming part of the supporting plate element which seems to be important to the defendants' hand-grip element as a whole.

Thus infringement is avoided by the clear distinction between the conceptions of the parties as expressed in their respective embodiments of such a part of the vault, although the purpose to be realized was common to both.

As to patent No. 2,812,966, the testimony which has been quoted is dispositive of the question of infringement.

To the quotation already set forth there should be added the following:

"The Court: Now, as to Exhibit M, (plaintiff's vault) the locking device is not concealed. Is that true?

"The Witness: Not concealed, your Honor. but it is in working position with the hand grip. It is attached to the hand grip.

"The Court: Is it concealed?

"The Witness: No, your Honor."
(Record p. 351.)

Since it was the concealment within the hand-grip that was regarded by the patentee as the patentable disclosure, the lack of such concealment in the plaintiff's structure sufficiently distinguishes the two latching devices, (there are mechanical differences as well) to indicate the holding hereby made, that plaintiff has not been shown to have infringed this patent.

The result of the foregoing rather tedious discussion of the evidence is that the plaintiff is to have judgment against the defendants in the sum of $12,956.53, and the several counterclaims asserted by defendants against plaintiff are dismissed on the merits.

If additional findings are desired, they are to be settled on notice.

Settle judgment in accordance with the foregoing.