**FEDERAL WELDING SERVICE, INC.,**
Plaintiff-Appellee,

v.

**Orestes A. DIOGUARDI, Jr., and Vincent E. Dioguardi, copartners doing business as Greenpoint Casket Company, Defendants-Appellants.**

No. 241, Docket 26620.

United States Court of Appeals
Second Circuit.

Argued Feb. 9, 1961.

Decided Nov. 16, 1961.

Booth, Lipton & Lipton, New York City (Harold L. Lipton, Lester Pollack, Edgar H. Booth, New York City, of counsel), for plaintiff-appellee.

Lichtig, Copland & Greenfield, New York City (Max M. Greenfield, New York City, of counsel), for defendants-appellants.

Before LUMBARD, Chief Judge, MADDEN,* Judge, U. S. Court of Claims, and WATERMAN, Circuit Judge.

* Sitting by designation.

WATERMAN, Circuit Judge.

In 1952, appellee, a Connecticut corporation of which one Brick was president, and appellants, Orestes A. Dioguardi, Jr. and Vincent E. Dioguardi, copartners doing business as Greenpoint Casket Company, a New York partnership, began the business relationship out of which this litigation arose. In accord with specifications Orestes Dioguardi furnished to appellee, appellee for the account of appellants made steel casket containers called burial vaults, which vaults appellants marketed to the mortuary trade. Appellants failed to pay for vaults delivered between September and December 1957, for other undelivered ones on hand, and for parts. Appellee, claiming a sum of $12,956.53 its due, brought suit against the appellants, residents of New York, in the New York state courts.

Appellants removed the case to the United States District Court for the Eastern District of New York and filed counterclaims. By their counterclaims appellants set forth that appellee was marketing on its own account a burial vault that was in competition with appellants' vault; and that by so doing appellee had violated its agreement with appellants not to compete, had broken an agreement of trust and confidence, had engaged in unfair competition with appellants, and had infringed two patents of appellants, all to the great damage of the appellants. In addition to their claimed damages appellants sought a permanent injunction to restrain further breaches by appellee.

At trial appellants conceded they owed the account appellee brought suit to collect; and the issues before the court became solely those raised by the counterclaims. After hearing, the trial judge determined that all of appellants' counterclaims should be dismissed on the merits, and judgment was accordingly entered for appellee for $12,956.53. The exhaustive opinion of the court below is reported at 184 F.Supp. 333 (1960). Thereafter, inasmuch as it had successfully defended against the counterclaims alleging patent infringement, Federal petitioned, pursuant to 35 U.S.C. § 285, for an award of attorney fees. The court awarded $1,750. Appellants appeal from the adverse judgment entered on their counterclaims, from the denial of their prayer for a permanent injunction, and from the award of counsel fees.

The facts behind this litigation have been carefully delineated by the trial court, and there is no necessity for reviewing them in detail. Federal Welding was engaged in a general steel-working and welding business and had manufactured metal burial vaults since 1925. Greenpoint had been engaged for many years in the business of making and selling wood and cloth-covered caskets and in selling equipment and supplies used by funeral directors.

By 1952, consecrated burial space in the Roman Catholic cemeteries of the Greater New York area had dwindled as the cemeteries had become more and more crowded. The diocese permitted three bodies to be buried, one above the other, in a single grave. Hence it was of substantial interest in the mortuary trade to devise burial structures that would permit of such burials. The problem arose from the fact that cemetery regulations prevented excavations any deeper than nine feet below the surface of the ground and municipal regulations prescribed that coffins had to be covered by at least three feet of earth. Hence only six feet of vertical space was usable for interments, and if three interments were to be had in one grave no box containing a casket could exceed 24 inches in height.

The public had become accustomed to richly decorated coffins, lined expensively, and a correlative demand had arisen for containers within which to place them for their permanent protection. These containers, though called burial vaults, are but boxes within which the coffin is placed prior to interment. By June 1952, no steel burial vault had been devised to permit safe use in triple burials. Orestes Dioguardi had devoted thought to this problem and believed that he had arrived at a design for a 24-inch-high metal burial vault that would combine eye appeal and utility and would conform to the reg-

ulations then in force in the Catholic cemeteries. He conceived of a vault that would be of an open-top design, that is, it had a lid at the top. A casket is lowered into such a vault from above and after the coffin is in place the lid is fastened down. The lid of Dioguardi's proposed vault was composed of three panels, a central flat panel, and two slanting side panels that sloped away from the flat central section and engaged the vertical sides of the vault. Two hand grips extended upward from each of the side panels near where these panels engaged the side walls. These grips rose to a level on a horizontal plane with the flat central panel of the lid. The entire vault, because of the attractiveness of the lid design, appealed to customers. Yet three vaults could be tiered one above the other, for an upper vault could safely rest on the flat central section of the lid and the four hand grips of the vault beneath it. Surrounded by the structure of the hand grips was part of the latching mechanism for sealing the vault.

Not having any manufacturing facilities of his own, Dioguardi approached Federal in June of 1952, and after receiving certain assurances from Brick, described his idea to Brick with the aid of a shoe box and some penciled drawings. Brick then made some sketches and submitted a sample metal vault for Dioguardi's examination; and the parties then reached an agreement by which Federal would manufacture for Greenpoint the steel open-top vaults, 24 inches high, conceived by Dioguardi, to be marketed by Greenpoint as its Jovarde model. Whether Federal also agreed to manufacture this type of vault exclusively for Greenpoint regardless of the state of the burial vault market is a substantial issue in this litigation.

The Jovarde had immediate commercial success. It was the only attractive twenty-four inch vault on the market until 1954. With Federal's knowledge Dioguardi obtained two patents, No. 2,674,-024 covering the Jovarde vault structure, applied for August 29, 1952, granted April 6, 1954, and No. 2,812,966, covering the vault's closure means, applied for March 4, 1954, granted November 12, 1957.

In 1954 Perfection Burial Vault Co. (Perfection) produced a twenty-four inch steel air-seal vault. An air-seal vault consists of a flat pan of metal on which the coffin is placed and over which a box-like structure without bottom, as a dome, is placed. In theory, the air captured within the structure should prevent moisture from attacking the coffin. The Perfection vault had four hand grips similar to the ones on the Jovarde except for the locking mechanism in the Jovarde grips. However, when upright, the top of the grips were in the same horizontal plane as the top of Perfection's dome, and thereby the grips served the same purpose as the Jovarde grips served by furnishing support for a vault placed above. Brick and Orestes Dioguardi had several discussions concerning this potential competitor. Brick mentioned that his company had previously asserted a right to meet such competition on its own by itself manufacturing a competing structure, but Dioguardi denied Federal had reserved such a right. These meetings continued for about a year, during which Federal refrained from manufacturing a vault of its own. Whether Federal believed that Perfection's vault was not a real threat to the Jovarde vault (Brick had written that the Perfection model was a water-trap), whether Federal was assured that Greenpoint would stop Perfection through a patent infringement action, or whether Federal was content for some other reason, is not clear. Nevertheless, Federal's customers became more insistent that it directly supply them with twenty-four inch steel burial vaults, for they complained that it was very difficult to obtain vaults from Greenpoint.

Finally, on July 28, 1955, asserting its right to meet competition, Federal announced to Greenpoint that it was going to make a twenty-four inch steel vault of a different design from that of the Greenpoint vault and market it to the mortuary trade. Again Dioguardi protested, but Federal promptly did market

its "Triad model," a twenty-four inch steel air-seal vault. This model was a financial failure and was withdrawn at the end of the year. Then Federal introduced its second Triad, an open-top steel vault twenty-four inches high, directly competitive with the open-top vault it had been manufacturing for Greenpoint. This second Triad met with success. In May 1956, Greenpoint began to be delinquent in paying Federal's account. However, the parties continued to deal with each other throughout the year 1957. Up to 1957 Greenpoint had continued to buy its Jovarde vaults exclusively from Federal, and Federal had continued to manufacture them for the account of Greenpoint. By December 1957 Greenpoint was causing its Jovarde vaults to be manufactured elsewhere, and by January 1958 its account with Federal had become so delinquent that Federal commenced this suit.

■ At the outset, without further discussion, we affirm the result the district court reached in declaring that the appellants' two patents are invalid for lack of invention. We do so on the able analysis found in the opinion below, 184 F.Supp. 333 at 339–344. In so doing, we of course also affirm the dismissal of the counterclaim for infringement. However, the disposition below of the counterclaims that relate to breaches of contract requires our examination.

To determine whether the district court committed error when it found that whatever agreement there was between the parties permitted Federal to manufacture and sell a competing twenty-four-inch open-top burial vault, we must consider the original conversation of June 1952 as it was testified to by both of the participants. Then we must determine whether subsequent conversations, correspondence, conduct or events modified or enlarged that original understanding.

Concerning this first discussion between Mr. Brick of Federal and him, Dioguardi testified on direct examination:

"I said, 'I would like you to make a sample for me,' which would there-

after be the steel, the open-top steel vault; that he would not manufacture it for anyone other than for me; that he would not divulge any information that I thought of, or, jointly with Mr. Brick; that he would never make a triple-burial vault for anyone else.

"Mr. Brick gave me his word of honor and his confidence, and not to mistrust my confidence in him."

Compare Brick's account of the same meeting on his direct examination:

"He told me that he had something in mind which we could manufacture, which he thought we could manufacture.

"He gave me to understand that it was something which could be protected, to prevent so that the sale could not become general.

"He asked me to keep it in confidence, and not to divulge his idea to anyone else.

"He gave me no idea of what he had in mind until after I had made a promise to do so."

Dioguardi used an old shoe box to demonstrate his idea, and from his description of it, his own penciled drawing, and subsequent sketches made by Federal, the plaintiff was able to produce a sample vault for Dioguardi's inspection on June 16, 1952. There is no evidence that during this period there was any dispute as to their working arrangements, or any modification of the terms agreed upon at the initial meeting.

On July 3, 1952, Brick wrote Dioguardi as follows:

"This letter is for the purpose of giving you our written guarantee that we will not make, for any person or firm except yourselves, a 12-gauge steel, open-top burial vault with a height of 24″ or less, unless one or more of our competitors start making similar vaults and selling them, either to you or to other persons or firms, in which case we reserve the right to meet competition" (Appellants' Exhibit F).

To determine Dioguardi's reaction to this letter we must again refer to his testimony and to that of Brick. On direct examination Dioguardi testified as follows:

"The Witness: I told Mr. Brick that the contents of this letter was utterly ridiculous because I did not want—we had the agreement, his trust—"

"The Court: Tell us what you said."

"The Witness: I didn't want him to manufacture the low vaults, the 24-inch-high vaults, or any type of low vaults—that he is not my competitor—he is my supplier. I could expect it from a competitor, to come in and try to produce the vault, but not somebody that I brought in, and bled my heart out to give him this business.

\* \* \* \* \* \*

"I didn't want Mr. Brick to be a competitor of mine, manufacturing the 24-inch boxes for himself or for anyone else. That was our agreement."

"*By Mr. Greenfield:* Q. And what did you do about that letter? A. I gave it back to Mr. Brick. I would not accept it."

On cross examination Dioguardi reiterated his position:

"A. Mr. Brick said to me that—he showed me this letter and I told him, well, I didn't want him to ever make a 24-inch-high vault in competition with me—we had an agreement, and he should stick to his agreement."

"Q. In other words, it was very important to you that Mr. Brick refrain from making any 24-inch-high vaults? A. Yes, it was.

\* \* \* \* \* \*

"Q. Referring to Exhibit F, in any event you objected to what Mr. Brick put into that letter. Is that right? A. That is right."

Compare Brick's testimony:

"Mr. Dioguardi assured me that he was planning to patent the design, that we wouldn't have any competition on it, and we wouldn't need to worry about it.

"I insisted that I wanted to reserve the right in case anything did come up, and I think the subject was dropped after that."

In his deposition before trial Brick explained Dioguardi's reaction to the letter more specifically.

"Q. What did Mr. Dioguardi say to you about the contents of the letter? A. Well, he never agreed or disagreed." [1]

Thus Brick admitted that Dioguardi did not accept his letter of July 3, 1952, or agree to its contents, and hence that the letter did not fix the parties' contractual relations. Judge Byers recognized this when he stated:

"In view of the unsatisfactory nature of the testimony as to the finality of the plaintiff's position as above outlined, the letter itself cannot be relied upon as the basis of a finding that the actual contractual terms of the relationship entered into, was as therein stated." 184 F.Supp. 333 at 336–337.

Therefore the arrangement entered into at the time of the original conversation between the parties, outlined above, in which Brick did not reserve a right to compete, remained unmodified. Nevertheless, Federal went forward with the production of Jovarde vaults without any justification for an assumption that Federal's July 3 written elaboration or modification of the contract had been accepted by Dioguardi.

Then, near the end of 1954, Perfection put its twenty-four inch air-seal vault on the market. Brick related his conversa-

---

1. After his oral deposition had been taken, Brick added in ink the words "or disagreed" at the end of this answer as typed. Of course it was permissible for him to do so. However, his purpose was unexplained, and, as was pointed out at trial, he was not cross-examined with reference thereto.

tions with Dioguardi concerning this potential threat:

"A.   I reminded Mr. Dioguardi of the terms of my letter of July 3rd, reserving the right to meet competition.

\*   \*   \*   \*   \*   \*

"He assured me that he would stop Perfection from manufacturing this vault by virtue of his patent—that I didn't need to worry about it—and he preferred that I do not make vaults, similar vaults, for anybody else.

\*   \*   \*   \*   \*   \*

"Q.   Did he tell you what kind of vaults not to make for anybody else? A.   24-inch-high vaults.

\*   \*   \*   \*   \*   \*

"We had a number of discussions, all covering the same subject, and all discussions about the same nature, the same complaints, the same answers."

In addition to this oral evidence, letters written by Brick were introduced.   On June 26, 1954, he wrote a letter to Dioguardi in which he said:

"I have played ball with you right along, observing not only the letter, but also the spirit of our agreement. Altho I have tried to get your approval of some means whereby I could sell 24″ high vaults to other casket houses, I have told all of them that in the absence of such approval I was not free to fill their orders for such vaults, and I don't think that it has done us any good either, especially with Boyertown."

And on April 15, 1955—after the Perfection vault had been put on the market —in a letter responding to a request by Bridge Casket Company for twenty-four-inch high vaults, Brick wrote the following:

"For a couple of years we have been making such a vault for Greenpoint Casket Company, the design having been originated and patented by them.   This vault is open top design, with a rubber gasket between the lid and the body of the vault.   In view of the fact that Greenpoint have a patent on this design and that, in addition, we have agreed not to make it for anyone else, it would be impossible for us to furnish you with such vaults."

But his customers persisted in requesting that he manufacture twenty-four inch vaults and so Brick wrote Dioguardi on July 28, 1955:

"I wanted to remind you that under the terms of our agreement with you, we are free to sell 24″ high vaults anywhere, whenever any other firm starts selling them in New York.

\*   \*   \*   \*   \*   \*

"So, in self-defense, we are arranging to furnish a 24″ high vault to them.   It will not be the same design as yours, nor the same as Perfection's.   I don't want the Perfection design because it is worthless, and I don't want to use your design because I think you would prefer that we do not, and we want to go along with you as much as we can without injury to ourselves."

What was Dioguardi's reaction to this letter?   He testified:

"Well, I told Mr. Brick that I objected to him making, as I have objected all along, making anything that runs in competition with the vault that I was now having Mr. Brick make.

"I said, 'It is not in the terms with our agreement.   You gave me your word of honor.' "

And Brick's testimony is to the same effect:

"He still objected to me furnishing 24-inch-high vaults to anyone except Greenpoint Casket Company.

"I assured him that it was a matter of business life or death for myself—that I had had to do it—that he had had notice from July 3, 1952, that I intended to do it under those circumstances, and I had no choice in the matter."

A consideration of all this evidence leads us to conclude that the district court was clearly erroneous in holding that the parties had put a practical construction on their agreement so as to permit Federal, after Perfection offered its model to the New York mortuary trade, to place on the market an open-top vault competitive with that of Greenpoint.

 Greenpoint continued to purchase its Jovarde vaults exclusively from Federal up to the year 1957. The district court apparently considered this fact important and found this conduct "consistent with an acquiescence in plaintiff's manufacture and sale of its Triad vault, now in suit." 184 F.Supp. 333, at 338. But this continued dealing is also consistent with the need of Greenpoint to purchase its specially made item from the sole manufacturer of that item, a supplier with whom Greenpoint had been dealing for several years. In the light of the other evidence set forth above, we find that the fact that Greenpoint continued to buy from Federal until the end of 1957 did not modify the original agreement the parties entered into.

However, unless Greenpoint obtained valid patents, the parties did not intend that Federal's promises not to compete with Greenpoint would bind Federal after Greenpoint ceased to buy its Jovarde vaults exclusively from Federal.

Appellee is liable to the appellants for the damages appellants have suffered from the unwarranted competition caused by the marketing by appellee of its second Triad vault but the extent of those damages is limited to the period of competition ending with the termination by Greenpoint of the exclusive dealing arrangement—the time when Greenpoint first ordered its Jovarde vaults from another manufacturer. Therefore we affirm the court below in the denial of injunctive relief.

Neither side should recover counsel fees under 35 U.S.C. § 285 (1958), for though the defendants did not prevail on their assertions of patent infringement they did present a meritorious counterclaim.

Affirmed in part, and in part reversed and remanded for further proceedings not inconsistent with this opinion.