**M. O. DANTZLER, Appellee,**

v.

**DICTOGRAPH PRODUCTS, INC.,**
**Appellant.**

**No. 8585.**

United States Court of Appeals
Fourth Circuit.

Argued June 8, 1962.

Decided Sept. 24, 1962.

Robert J. Ensher, New York City (Clayton & London, O. W. Clayton, Charlotte, N. C., Skadden, Arps, Slate, Meagher & Flom, and Stephen S. Ziegler, New York City, on brief), for appellant.

William B. Webb, Charlotte, N. C. (Carpenter, Webb & Golding, Charlotte, N. C., on brief), for appellee.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

SOPER, Circuit Judge.

This suit, now before us the second time, was brought by M. O. Dantzler v. Dictograph Products, Inc., to recover damages for breach of contract and for unlawful discrimination against him in violation of the Clayton Act, 15 U.S.C.A. §§ 13(d) and 13(e). Under a contract between the parties Dantzler, who was located at Charlotte, North Carolina, was a distributor for Dictograph Acousticon hearing aids in seventeen counties in North Carolina and four counties in South Carolina from March 1, 1954 until April 18, 1957. In the early part of March 1957 Dictograph entered into negotiations with Harold K. Green and Jerry K. Green, also located in Charlotte, which culminated in a contract signed by the Greens on March 27 and by Dictograph on April 1, 1957, whereby they also became distributors of Acousticons in the same territory. Dantzler was not told of the new agency by Dictograph but heard of it from a customer on March 27, and on April 18, 1957 he received formal notice from Dictograph of the termination of his distributorship contract.

Dantzler's contract did not give him the sole right to sell the product in the prescribed territory and it expressly provided that it might be terminated at any time with or without cause by either party by written notice sent by registered mail. The contract also provided that upon its termination Dictograph was entitled to make copies of Dantzler's lists of names of users of Acousticon. By reason of these provisions Dantzler abandoned his cause of action based on breach of contract during the course of the proceedings.

Dantzler, however, pressed the suit on the ground that Dictograph had unlawfully discriminated in favor of the Greens and against him. The Clayton Act provides in effect that it shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser of a commodity bought for resale by furnishing any services or facilities connected with the sale or offering for sale upon terms not accorded to all purchasers on proportionally equal terms. At the first trial in the District Court it was shown that during the period between March 26 and April 18, 1957, when both Dantzler and Green were authorized distributors of the product in the territory, Dictograph furnished services and facilities to Green not afforded to Dantzler. On March 25 Dictograph mailed letters to 1344 persons who were users of the hearing aid in the territory, including users who had been customers of Dantzler, and to other prospective customers in the area. The letters announced the appointment of the Greens as distributors of the product and also announced that a factory trained technician would conduct a hearing aid clinic between April 1 and April 4 in connection with the opening of the new distribution center. A large number of additional copies of the letter were sent to the Greens for their own use. Dictograph also paid for four newspaper advertisements of the Green opening and furnished, free of charge, to Green one of its technicians to inspect and repair hearing aids bought by customers during the clinic. Similar services and facilities were not furnished to Dantzler during the remaining 23 days of his contract.

When the case was first tried in the District Court on this evidence, it was withdrawn from the jury and judgment was entered for the defendant, and an appeal was taken to this court. In our

opinion (4 Cir., 272 F.2d 172) the facts were stated most favorably to Dantzler. They showed·that Dictograph had discriminated in favor of Green and against Dantzler in the manner above described and, therefore, we reversed the judgment and remanded the case for a new trial in order that Dantzler should have the opportunity to "offer evidence as to pecuniary losses within the period March 26—April 18, 1957, resulting from Dictograph's discriminatory practices."

At the new trial evidence of the same acts on Dictograph's part was offered but it was shown that Dantzler had been given the services of a technician by Dictograph at a hearing aid clinic held by him in the fall of 1956 and, consequently, the charges of discriminatory conduct on Dictograph's part, which were submitted to the jury, were confined to the circular letters and to the payment in full by Dictograph of advertisements for Green in contrast with the payment by Dictograph of only one-half of the advertisements for Dantzler. At the trial Dantzler was the only witness in his own behalf. He was permitted over objection to testify in substance and effect as follows. He lost from $2000 to $2500 in gross profits on sales to twelve of his customers who had purchased Acousticons from the Greens a few days after their opening. After the delivery of the Dictograph letters on March 25th announcing the establishment of the Green agency, he lost the patronage of 114 of his customers who were users of Acousticons. Each customer was worth from $75 to $100 per year to a distributor. He further testified over objection that he had had net profits from his agency running from $6500 to $7500 for the years 1954, 1955 and 1956, but suffered annual losses running from $57 to $629 in the years 1957 to 1960; and that he was finally obliged to go out of business although shortly after his contract with Dictograph was terminated he secured the agency for Radioear, a hearing

aid which he deemed to be superior to Acousticon. Except for the fact that these losses took place after the discriminatory acts, there was no direct evidence that the losses were caused by the acts within the 23 days between March 26 and April 18 and were not caused by the termination of the Acousticon agency in accordance with his contract.[1]

The case was submitted to the jury on a charge in which the jury were told two or three times that this court in its opinion had held that Dictograph's preferential treatment of Green was unlawful and that Dantzler was entitled to such damages as were caused thereby; but the jury were not told that in our opinion the damages were confined to pecuniary losses within the 23 day period. The jury were, however, told in effect that if the losses were caused by violation of the Clayton Act Dantzler could recover but if the losses and the destruction of his business had been caused by the lawful termination of the contract and the loss of the right to sell the Acousticons in the territory he could not recover. The jury were also told in effect that if they found that the discriminatory acts caused the losses, then in estimating the amount they might consider Dantzler's testimony that he lost $2000 to $2500 gross profits on sales made by the Greens to twelve of his former customers in 1957, that he lost $75 to $100 per year on 114 customers who withdrew their patronage, and that he had had a substantial profit from his business in the years 1954 to 1956 but had suffered losses in each of the years 1957 to 1960.

The jury found for the plaintiff in the sum of $10,000. On motion for new trial, the District Judge indicated that in his opinion the verdict was excessive and thereupon he remitted the sum of $5000 with the consent of the plaintiff and judgment was accordingly entered for thrice this amount in the sum of $15,000 under the statute. The Judge also allowed coun-

1. There was additional testimony that Dantzler had 35 Acousticon hearing aids and 100 receivers, on hand, when the contract was terminated, which he sold on the market for what he could get; but the proof does not show that he suffered any loss in these transactions.

sel fees to the attorneys for the plaintiff in the sum of $5000.

█ It is first contended by the appellant that the District Court erred in not confining the recoverable damages to those actually suffered within the 23 days as suggested in the former opinion of this court. We think that this contention places too narrow a construction upon our opinion. It is true that we spoke of pecuniary losses within the period and made no specific reference to damages suffered after the period but caused by events occurring during the period. In our view both elements of damages are recoverable. The plaintiff is entitled to recover for the ill effects of unlawful conduct within the period whether they were realized in the course of the 23 days or thereafter. See William H. Rankin Co. v. Associated Bill Posters, 2 Cir., 42 F.2d 152. The test is whether the damages were caused by the unlawful acts of the defendant. We find nothing in the cases on which the defendant relies [2] in conflict with this rule.

We think, however, that there was error in admitting over objection certain evidence which the Judge told the jury that they might consider in arriving at the size of their verdict. As we have seen the jury were told that they might consider the testimony that 12 of Dantzler's customers bought hearing aids from the Greens shortly after their appointment on which he would have earned gross profits from $2000 to $2500 if the business had not been diverted to them by Dictograph's letter and advertisement. None of these customers was called as a witness by Dantzler and he did not show that he had personal knowledge of the sales which he did not witness. The facts which he related to the jury were obviously based on hearsay information. It is true that subsequently the Greens testified that they had sold hearing aids to three of the persons named by Dantzler during April and May 1957; and that they serviced instruments for two of the twelve in April or May 1957 and sold hearing aids to five others of the twelve in 1958 or 1959 when they were the only distributors of Acousticons in the area. It may fairly be inferred that the customers which Green secured during April or May 1957 were influenced by the circular letters which Dictograph sent out, but it would seem that the sales of Acousticons which took place in 1958 and 1959 were made by the Greens rather than by Dantzler because his distributorship contract was cancelled in 1957.

Dantzler testified that he lost the sale of one instrument at $600 to a man who cancelled an appointment with him on the morning the Dictograph letters were received, and afterwards bought the instrument from the Greens. The testimony also tended to show a loss of business by Dantzler by the discriminatory acts.

█ With the exception of Dantzler's testimony as to this sale and the testimony of the Greens that they sold instruments or services to the members of the group in April or May 1957, we think testimony as to other members of the group was inadmissible since it was not based on Dantzler's personal knowledge and it was not shown that the loss of business was attributable to the discriminatory acts of the defendant. See Momand v. Universal Film Exchanges, 1 Cir., 172 F.2d 37, 42–44.

Similar observations may be made as to the testimony that after the appointment of Green Dantzler lost 114 customers each worth from $75 to $100 a year to him as a customer. The Judge called attention to this testimony as proper to be considered by the jury in estimating the amount of the damages, but he did not advert to the fact that no attempt was made to show that these customers had taken their business elsewhere nor to the fact that the estimated annual value of such customers was based on the general experience that on the average a customer would buy a new instrument every three years, a period in excess of

---

2. Western Oil and Fuel Co. v. Kemp, 8 Cir., 245 F.2d 633; Federal Welding Service, Inc., v. Dioguardi, 2 Cir., 295 F. 2d 882.

the life of his agency. Taken at its best, the testimony meant only that Dantzler had lost 114 customers after the agency was taken away from him and no one ventured to show that the loss was caused by Dictograph's actions in the 23 days and not by the fact that Dantzler's contract was terminated and he no longer had the privilege of selling the product to his old customers. None of the 114 customers was called as a witness and the jury was left merely to speculate as to the reasons why Dantzler lost the business. We think that the admission of this testimony coupled with the Judge's allusion to it in the course of his charge was highly detrimental to the defendant.

■ A like criticism must be made of the admission in evidence of the testimony, to which the Judge referred in his charge, that Dantzler suffered annual business losses in the period 1957 to 1960, after he had lost the Acousticon account, in contrast with the testimony that he had made profits in 1954 to 1956 when he was an Acousticon distributor. The fact that the losses were subsequent to the illegal acts does not of itself establish causal connection. It is uniformly held that liberality may be used in estimating the amount of damages after it has been shown that they were caused by acts contrary to the anti-trust statutes, but that this liberality does not extend to proof that the damages were caused by the illegal acts. In Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544, it was shown that the plaintiff had been injured in his business as the result of defendant's unlawful combination in violation of the Anti-Trust Act and the inquiry was as to the amount of recoverable damages. On this point the court said:

"Nor can we accept the view of that court that the verdict of the jury, in so far as it included damages for the first item, cannot stand because it was based upon mere speculation and conjecture. This characterization of the basis for the verdict is unwarranted. It is true that there

was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."

This rule has been frequently invoked where the crucial question was whether the damages were actually caused by acts in violation of the statute. See Flintkote Co. v. Lysfjord, 9 Cir., 246 F.2d 368, 392; Talon, Inc., v. Union Fastener, Inc., 9 Cir., 266 F.2d 731, 736; Momand v. Universal Film Exchanges, 1 Cir., 172 F. 2d 37; E. V. Prentice Mach. Co. v. Associated Plywood Mills, Inc., 9 Cir., 252 F. 2d 473, 477.

■ In the instant case the evidence shows that Dantzler lost money in 1958, 1959 and 1960 and finally was obliged to close his business; but this evidence does not tend to show that the losses were caused by the favorable advertisement given to the Greens in 1957 and were not caused by the fact that Dantzler lost the Acousticon account in 1957 and thereafter, except for the small stock of goods he had on hand at the time, could not offer the instrument for sale. The need for one who claims damages in a suit of this kind to show the causal connection between the losses he suffers and the illegal acts of the defendant, is clearly shown in the cases cited and other decisions of the courts. See Enterprise Industries v. Texas Co., 2 Cir., 240 F.2d 457; Sun Cosmetic Shoppe, Inc. v. Elizabeth Arden Sales Corp., 2 Cir., 178 F.2d 150, 153.

■ Dictograph contends that the District Judge erred in his charge in not limiting the amount of the plaintiff's recoverable damages to the amount of the

profits derived from the sales diverted to the Greens. We find no error in this respect. The plaintiff's recovery in the instant case is measured by the losses he suffered from the discriminatory acts and not by the gains of the favored competitor although the latter may well be taken into account in reaching the final result.

Reversed and remanded for new trial.